1  Seth A. Gold (SBN 163220)
   *Seth.Gold@btlaw.com*
2  Roya Rahmanpour (SBN 285076)
   *Roya.Rahmanpour@btlaw.com*
3  **BARNES & THORNBURG LLP**
   2029 Century Park East, Suite 300
4  Los Angeles, California 90067
   Telephone:   (310) 284-3880
5  Facsimile:   (310) 284-3894

6  Todd G. Vare (*Admitted pro hac vice*)
   *Todd.Vare@btlaw.com*
7  Paul B. Hunt (*Admitted pro hac vice*)
   *Paul.Hunt@btlaw.com*
8  Jeff M. Barron (*Admitted pro hac vice*)
   *Jeff.Barron@btlaw.com*
9  E. Sahara L. Williams (*Admitted pro hac vice*)
   *Sahara.Williams@btlaw.com*
10 **BARNES & THORNBURG LLP**
   11 S. Meridian Street
11 Indianapolis, IN 46204
   Telephone: (317) 236-1313
12 Facsimile: (317) 231-7433

13 *Attorneys for Plaintiff* CAO Lighting, Inc.

14

## IN THE UNITED STATES DISTRICT COURT

15

## CENTRAL DISTRICT OF CALIFORNIA

16

17 | CAO LIGHTING, INC., | Case No.: 2:20-cv-04926-AB-SP |

18 | Plaintiff, | [Assigned to the Hon. André Birotte Jr.] |

19 | v. | **PLAINTIFF CAO LIGHTING, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |

20 | FEIT ELECTRIC COMPANY, INC., a |
21 | California corporation |

22 | Defendant. | **Hearing Date**: Sept. 1, 2021 |

23 | | **Hearing Time**: 10:00 a.m. |
   | | **Location**: Courtroom 7B |

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   Background ..................................................................................................... 1

II.   Overview of U.S. Patent 6,465,961 .............................................................. 1

III.   Litigation and Examination History of the '961 Patent ............................. 3

IV.   Legal Standards ............................................................................................. 4

V.   Claim Terms and Proposed Constructions .................................................. 6

    A.   "monochromatic light" (claim 1) ......................................................... 6

    B.   "in said interior volume" (claim 1) / "in said base" (claim 33) ...................... 11

    C.   "heat sink" (claim 1) ........................................................................... 14

    D.   "a plurality of panels" (claim 1) ......................................................... 16

    E.   "oriented to facilitate emission of light…in desired directions" (claim 1) ...... 17

    F.   "a contact layer on which an electron may be mounted" (claim 7) ................. 19

    G.   "reflective layers … serving to reflect light emitted by said active layer" (claim 8) ........................................................................................... 22

VI.   Conclusion ................................................................................................... 24

1

## **TABLE OF AUTHORITIES**

**Page(s)**

2

3

**Cases**

4
*Aqua Shield, Inc. v. Inter Pool Cover Team*,
5
   No. 2:09-cv-13-TS, 2011 WL 5546234 (D. Utah Nov. 14, 2011) ...................... 16, 17

6
*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) ............................................................................. 5, 17
7

8
*Cannon Rubber Ltd. v. The First Years, Inc.*,
   163 Fed. Appx. 870 (Fed. Cir. 2005) .................................................................... 12, 13
9

10
*CAO Lighting, Inc. v. Light Efficient Design*,
   No. 1:17-cv-07359 .....................................................................................*passim*

11

12
*CBT Flint Partners, LLC v. Return Path, Inc.*,
   654 F.3d 1353 (Fed. Cir. 2011) ............................................................................. 5, 19

13

14
*Comark Communications, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ..................................................................................... 4

15
*Cree, Inc. v. SemiLEDs Corp.*,
16
   2012 WL 975697 (D. Del. 2012) ......................................................................... 20, 23

17
*Encap LLC v. Oldcastle Retail Inc.*,
   No. 11-c-808, 2012 WL 2339095 (E.D. Wis. June 19, 2012) .................................. 18
18

19
*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
   750 F.3d 1304 (Fed. Cir. 2014) ...................................................................................... 5

20

21
*Golden Bridget Tech., Inc. v. Apple Inc.*,
   758 F.3d 1362 (Fed. Cir. 2014) ...................................................................................... 5

22

23
*Innogenics v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) ...................................................................................... 4

24

25
*Innova/Pure Water, Inx. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ...................................................................................... 4

26
*Markman v. Westview Instruments*,
27
   517 U.S. 370 (1996).......................................................................................................... 4

28
*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)............................................................................................... 5, 17

ii

*Pavo Solutions, LLC v. Kingston Technology Company, Inc.*,
 2018 WL 5099486 (C.D. Cal. 2018) ..................................................................20

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ........................................4, 5, 11

*RevoLaze LLC v. J.C. Penney Company, Inc.*,
 No. 2:19-cv-00043-JRG, 2020 WL 697891 (E.D. Tex. Feb. 11, 2020)..............18, 19

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
 242 F.3d 1337 (Fed. Cir. 2001) ..................................................................12

*SignalQuest, Inc. v. Ten-Ming Chou*,
 No. 11-cv-392-JL, 2015 WL 471008 (D.N.H. Feb. 4, 2015)..................................13

*Teleflex v. Ficosa No. Am. Corp.*,
 299 F.3d 1313 (Fed. Cir. 2002) ..................................................................12

*U.S. Surgical Corp. v. Ethicon, Inc.*,
 103 F.3d 1554 (Fed. Cir. 1997) ............................................................10, 14

*Vestem Biopharma, Inc. v. California Stem Cell Treatment Center, Inc.*,
 No. 2:19-cv-04728-AB-FFM, 2020 WL 5648353 (C.D. Cal. Sept. 9,
 2020) ....................................................................................4, 11, 16

*Zadro Products, inc. v. Feit Electric Co., Inc.*,
 No. 20-cv-101-JVS, 2021 WL 144247 (C.D. Cal. Jan. 6, 2021) ..................19, 22, 23

**PLAINTIFF CAO LIGHTING, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# LIST OF CITED EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | U.S. Patent  No. 6,465,961 with Ex Parte Reexamination Certificate, dated September 2, 2014 appended thereto |
| 2 | Parties' draft joint claim construction chart, dated June 16, 2021 |
| 3 | Declaration of James R. Shealy, Ph.D. |
| 4 | Memorandum Opinion of the U.S. District Court for the Northern District of Illinois, *CAO Lighting, Inc. v. Light Efficient Design*, No. 1:17-cv-07359, Doc. 83, dated April 3, 2019 |
| 5 | USPTO Non-Final Action, dated January 2, 2014, in *Inter Partes* Reexamination, Control No. 95/000680 |
| 6 | USPTO Non-Final Action, dated January 23, 2014, in *Ex Parte* Reexamination, Control No. 90/012597 |
| 7 | *Ex Parte* Reexamination Certificate, dated September 2, 2014 |
| 8 | *Inter Partes* Reexamination Certificate, dated May 11, 2017 |

In this patent infringement case, Plaintiff CAO Lighting, Inc. ("CAO Lighting") asserts that Defendant Feit Electric Company, Inc. ("Feit") infringes U.S. Patent No. 6,465,961 ("the '961 patent"). Feit identified seven claim terms that it submits should be construed by the Court. For each of these terms, CAO Lighting believes that the plain and ordinary meaning is the appropriate construction (where any construction is even necessary), while Feit either asserts the term is indefinite or improperly seeks to re-write the claims to import limitations that are contrary to the plain meaning of the claims.

## I.    Background

Dr. Densen Cao, who has a Ph.D. in materials science and engineering from the University of Utah, is an inventor on dozens of patents directed to various uses of light emitting diodes (LEDs). Based on his LED research and pioneering patents in LED curing lights, Dr. Cao formed CAO Group, Inc. in 2000 to market and sell the very first commercial LED curing light to dentists around the world. Through another invention, CAO Group and Dr. Cao introduced the first compact diode soft-tissue laser in 2002. During this same period of LED research and innovation, Dr. Cao conceived of the invention that solved a problem that the lighting industry had struggled with: how to create an LED light source for general illumination purposes, using high-powered LEDs that could output white light, in a structure that effectively managed the heat from the LEDs but that could also be used to retrofit and replace traditional incandescent lamps and fixtures. Dr. Cao's foundational invention is the platform to nearly every LED-based light on the market today and is the subject of a patent application filed on August 24, 2001, which ultimately issued as the '961 patent. In 2013, the LED lighting division of CAO Group was spun off into CAO Lighting, Inc. and the '961 patent was assigned to CAO Lighting.

## II.    Overview of U.S. Patent 6,465,961

The '961 patent is directed to use of semiconductor light sources (such as LED light sources) to provide visible light for general illumination of spaces such as homes, offices, garages, roadways, and other indoor or outdoor spaces. Although ubiquitous in

**PLAINTIFF CAO LIGHTING, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

the marketplace today, in 2001 there were no available LED general purpose lighting products. General purpose lights at that time still used traditional incandescent or fluorescent technology. LED lighting was limited to panel displays (such as computer screens), signal lighting, and other instrumentation purposes. Dr. Cao saw a distinct need to replace traditional incandescent and fluorescent general purpose lighting with single color, high powered LED light sources having an effective dissipation of the heat produced by those LEDs.

The '961 patent states that the shape of the LED-based light source can be of "any desired shape," but one commonly known shape is the "traditional bulb-shaped" design and is illustrated in Figure 1 of the '961 patent:



**Fig. 1**
AMENDED

*See* Ex. 1 ('961 patent).[1]  Although not limiting, this exemplary embodiment illustrates the basic elements of '961 patent's invention. The LED light source includes an enclosure, which may be connected to a support structure and to a base for electrical connection to an electrical source. In the above figure, the base is the typical "Edison screw" traditionally used by incandescent bulbs. The LED light source includes LED chips that are arranged on thermally conductive heat sink panels such that the heat from the LEDs is drawn away. The LEDs emit single color light (typically blue) of a

---

[1] All references to Exhibit numbers in this brief refer to exhibits to the concurrently filed Declaration of Todd Vare.

sufficient power output (greater than about 40 milliwatts). In this exemplary embodiment, the LEDs are coated with a yellow phosphor that results in the output of white light for general purpose illumination regardless of the color of the light emitted by the LEDs.

**III.    Litigation and Examination History of the '961 Patent**

The '961 patent was originally filed as an application on August 24, 2001, and was issued as a patent on October 15, 2002. In May 2011, CAO Group (CAO Lighting's predecessor in interest to the '961 patent) filed suit for patent infringement of the '961 patent in the District of Utah against Feit, among other defendants. Two of those defendants, GE Lighting and Osram Sylvania, filed petitions for *inter partes* reexamination and *ex parte* reexamination of the '961 patent. The Utah lawsuit was stayed pending reexamination. During reexamination, original claims 1-20 of the '961 patent were canceled. On September 2, 2014, the Patent Office issued an *Ex Parte* Reexamination Certificate holding that new claims 21-103 were deemed patentable. Ex. 7. On May 11, 2017, the Patent Office issued an *Inter Partes* Reexamination Certificate. Ex. 8. The Utah lawsuit was ultimately dismissed without prejudice, and CAO Lighting now asserts the '961 patent against Feit in this action.

In addition to this action, the '961 patent was the subject of another patent infringement lawsuit in the District Court for the Northern District of Illinois, *CAO Lighting, Inc. v. Light Efficient Design*, No. 1:17-cv-07359 (the "Light Efficient Design case"). On April 3, 2019, the Illinois district court entered an order construing certain claim terms of the '961 patent, including some that are now presented to this Court. Ex. 4. The Light Efficient Design case was dismissed by joint stipulation on July 24, 2020. CAO Lighting has also asserted the '961 patent against other defendants, including Lights of America (No. 5:20-cv-02367-AB-SP) in this District as well as GE, GE Lighting, Current Lighting Solutions, Osram Sylvania, and Ledvance in the District of Delaware (Nos. 20-cv-681-MN and 20-cv-690-MN). No claim construction has yet occurred in those pending actions.

1

## IV.    Legal Standards

2          The claim construction legal standards are well known to this Court. *See, e.g.,*

3   *Vestem Biopharma, Inc. v. California Stem Cell Treatment Center, Inc.*, No. 2:19-cv-

4   04728-AB-FFM, 2020 WL 5648353, at *1-3 (C.D. Cal. Sept. 9, 2020). Since *Markman*

5   *v. Westview Instruments*, 517 U.S. 370 (1996), district courts have been required to

6   construe or interpret claim terms that are in dispute. However, courts are not required to

7   construe claim terms that are not in dispute, or which are merely common words that

8   should be accorded their ordinary meaning. *Vestem Biopharma*, 2020 WL 5648353 at *7

9   (declining to construe claim term "inflammation" because it is not the type of technical

10  term that a layperson would find difficult to understand).

11         A claim term generally must be given its ordinary and customary meaning as

12  would have been understood by persons of ordinary skill in the art at the time of the

13  invention. *Id.* at *2 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-1314 (Fed. Cir.

14  2005) (*en banc*)). In some cases, the ordinary meaning is readily apparent, "requiring

15  only a common sense application of a widely accepted meaning." *Id.* (citing *Phillips*,

16  415 F.3d at 1314).

17         Throughout the claim construction process, the claim language itself is

18  paramount. *Innogenics v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008). Claim

19  construction must begin and remain centered on the claim language itself. *Innova/Pure*

20  *Water, Inx. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

21  "The person of ordinary skill in the art is deemed to read the claim term not only in the

22  context of the particular claim in which the disputed term appears, but in the context of

23  the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Although

24  claim terms must be read in light of the specification, the Federal Circuit has repeatedly

25  cautioned against limiting claims to preferred embodiments or specific examples in the

26  specification. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed.

27  Cir. 1998).

28

PLAINTIFF CAO LIGHTING, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

The prosecution history, as needed, may also be used to understand how the term has been used by those of skill in the art. *Phillips*, 415 F.3d at 1317. Additionally, the Court may consider extrinsic evidence, but it is "less significant than the intrinsic record" in understanding the scope of the patent claim. *Id.* at 1317-18.

There are only two exceptions to the general rule that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during production." *Golden Bridget Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding these exceptions apply are "exacting." *Id.*

Of the seven claim terms that Feit seeks to have construed, Feit asserts that four of them cannot be construed because Feit believes they are indefinite. For these terms, Feit has the burden of proving by evidence both clear and convincing that the claim terms fail to inform those skilled in the art about the scope of the invention with reasonable certainty. *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Moreover, claim definiteness is not considered in a vacuum but always in light of the claim language and specification of the asserted patent, as well as the teachings of the prior art and understanding of persons of skill in the art. *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359 (Fed. Cir. 2011).

As discussed below, Feit cannot meet this burden. Throughout the multiple reexaminations of the '961 patent, neither the USPTO nor the parties seeking reexamination (GE Lighting and Osram) believed any of these terms were indefinite. In fact, Feit also had no difficulty understanding the scope of the patent claims when it

recently submitted its invalidity contentions in which it identified features in the prior art that allegedly correspond to these allegedly "indefinite" terms. In doing so, Feit even utilized CAO's proposed construction. Indeed, each of the disputed claim terms is easy to understand and not indefinite.

## V.    Claim Terms and Proposed Constructions

### A.    "monochromatic light" (claim 1)

| CAO Lighting's Position | Feit's Position |
|---|---|
| Not indefinite. Light perceived as having or consisting of one color. | (1) Indefinite; or<br>(2) Light of a single wavelength or narrow range of wavelengths. |

CAO Lighting believes that the term "monochromatic light" should be given its ordinary meaning as light having a single color, while Feit asserts that the term is indefinite. The term "monochromatic light" is not indefinite. It has a clear and ordinary—and literal—meaning of "one color": mono means one, and chroma means color. Moreover, the '961 patent specification, the reexamination history (including how petitioners and the USPTO viewed the term), and the Illinois district court in the *Light Efficient Design* case all support CAO Lighting's construction of monochromatic light as light of a single color.

The specification of the '961 patent supports the construction of "monochromatic light" as light having a single color. In describing the need in the art to which his invention is directed, Dr. Cao said: "A distinct need is felt in the prior art for a semiconductor light source for illuminating a space *with a single color light in the visible range* and which can efficiently dissipate the heat that they produce." '961 patent, col. 1:46-40 (emphasis added). Dr. Cao further stated that, "[f]or example, if the light source uses *blue* LEDs to generate light, but it is desired to illuminate a room with white light, the interior surface [of the LED chip] may be covered with a phosphor coating to convert blue light into white light." *Id.*, col. 2:67-3:3. Two examples of semiconductor chips are described by Dr. Cao at Figures 5a and 5b; both are described

6

as semiconductor chips "of the invention" that emit "single color light." *Id.*, col. 2:27-30. More specifically, the '961 patent specification states:

> FIGS. 5a and 5b depict a semiconductor chip system that emits white light. In FIG. 5a, there is a GaN based semiconductor chip 2000 depicted. It includes a GaN system 5001 built on an insulative sapphire substrate 5002 capable of emitting *blue light*, the general structure of which is known in the prior art. A light conversion layer 5003 such as AlGaInP (aluminum gallium indium phosphate) adjacent the sapphire layer 5002 opposite the GaN system 5001. Light emitted from the GaN system will travel through the sapphire layer 5002, through the AlGaInP 5003 to exit the chip system. Some of the *blue light* will be absorbed by the AlGaInP to emit yellow light, and some of the *blue light* will be transmitted through the AlGaInP. *The combination of blue and yellow light emitted by the chip ... will appear as white light to human eyes*. Referring to FIG. 5b, the chip 2000 is depicted following application of an exterior light conversion coating or layer 5007 such as phosphor. Light which exits through the phosphor such as 5004a will be converted in wavelength to white, making a useful light for illuminating physical spaces. A coating or layer to convert *monochromatic light* to white light may include phosphor powder, YAG/Ce and others.

*Id.*, col. 6:56-7:12 (emphasis added).

As described in this specification passage, the term "white light" does not indicate a specific color. *Id.*, col. 6:56-7:12. Rather, white light—like that used in general illumination—is a combination of multiple "colors," or a combination of energy waves across a breadth of the visible spectrum. An LED (or LED chip) does not itself output "white light" but must be manipulated to output white light. Thus, when referring to purpose of the invention to illuminate spaces used by humans with white light, the '961 patent consistently refers to the use of LEDs

7

that emit monochromatic (single color) light, such as blue light or blue LEDs. The '961 patent also describes one technique known in the art to turn monochromatic light emitted by an LED into white light: apply a yellow phosphor coating.[2]

The extensive file history of the '961 patent paints a very consistent picture. In Non-Final Actions on both the *inter partes* reexaminations and the *ex parte* reexamination, the USPTO found that prior art asserted by GE Lighting and Osram disclosed LEDs that emit "monochromatic light" based on single color disclosures (e.g., red, blue, etc.):

- The LED chips of Begemann "emit monochromatic light, e.g., red, blue, green, or yellow" (Ex. 5 at CAO_DE_000770); Ex. 6 at ACO_DE_004843);

- The LED chips of Waitl "emit monochromatic light, i.e., UV or blue, that is converted by the luminescence conversion layer 36 to white light" (Ex. 5 at CAO_DE_000773; Ex. 6 at CAO_DE_004847);

- The LED chips of Wojnarowski "shows a coating 46 for converting monochromatic light (e.g., blue, or UV) emitted by said chip to white light" (Ex. 5 at CAO_DE_0008071).

The USPTO consistently understood "monochromatic light" emitted by LEDs as a single color (e.g., red, blue, green, yellow, UV). Moreover, in its invalidity contentions filed in this case, Feit also relies on some of the same prior as a disclosure of single color (e.g., red, blue, or green LEDs) as emitting "monochromatic light."

---

[2] There are multiple ways to produce white light from monochromatic LEDs. One way was to use a single LED chip emitting a single (monochromatic) color, such as blue. To convert the blue light to white light, a photoluminescent phosphor coating would be used. Some of the blue light would be converted to yellow light by the yellow phosphor coating and some of the blue light would pass through the yellow phosphor coating without being converted. Together, blue light and yellow light would be output as "white light." The '961 patent claims this way of outputting white light to illuminate spaces. Alternatively, multiple LEDs that emitted different monochromatic (single color) lights (*e.g.*, red, green, and blue LED chips) can be used and blended into what is perceived as "white light." *See* Ex. 3, Shealy Decl. at ¶¶ 28-29.

In sum, Feit's indefiniteness argument cannot be established by clear and convincing evidence. Perhaps recognizing the weakness in its claim that the term "monochromatic light" is indefinite, Feit falls back on a construction that require "monochromatic light" be a light of a single wavelength or a narrow range of wavelengths. As discussed above, however, this is simply not how the term "monochromatic light" is used in the '961 patent; nor is it how it was applied during the extensive reexamination history. Feit's alternative construction of "monochromatic light" based on wavelengths was rejected by the Illinois District Court in the *Light Efficient Design* case. There, the defendant advanced the construction that "monochromatic" should be limited to a single wavelength. Ex. 4 at 11-12. The Illinois District Court noted that "LEDs emit various colors depending on the elements used in the semiconductor." *Id.* at 12. Although a dictionary definition of "monochromatic" cited by the Court included both a definition of "(1): having or consisting of one color or hue" and "(2): consisting of radiation of a single wavelength," the Illinois District Court held that the definition of "one color" was the construction most consistent with the intrinsic and extrinsic evidence. *Id.* at 12-17. Among other points, citing the claim language (including claims 21, 42, and 77), the Court stated: "The claims consistently reference 'monochromatic' in terms of 'visible light'—that is, visible to humans. As humans cannot see wavelength, only color, it stands to reason that when 'monochromatic' precedes 'visible light,' the claim refers to emitting light that is one color." *Id.* at 13 (further noting that the claims "do not reference wavelength"). The Court also found that the defendant's extrinsic evidence—a declaration submitted by Eric Bretschneider—"fails to overcome the plain meaning of the claim language." *Id.* at 17. The Court therefore construed "monochromatic" to mean "one color." *Id.* at 32.

Indeed, Feit's alternate proposed construction is really just the scientific explanation how a person sees a single color (monochromatic visible light): for example, a single color (blue) will have a bandwidth which is relatively narrow compared to the entire visible spectrum, or the entire electromagnetic field. Ex. 3,

Shealy Decl. at ¶¶ 25-27. However, the human eye is only sensitive to a limited band of these waves, called the visible spectrum. *Id.* As shown below, the visible light spectrum is the radiation, or light, with wavelengths from about 380 nanometers (near the violet portion) to about 780 nanometers (near the red portion). *Id.* at 26.



Thus, when humans see or perceive a color, they are seeing light from a portion of the visible spectrum. For example, blue light is found in the visible spectrum between about 450 and about 495 nanometers as shown in the diagram above. *Id.* at ¶ 27. When energy within this band is emitted, humans "see" the color blue, *i.e.*, a monochromatic light. *Id.*

Claim construction does not require, or even allow for, loading scientific explanations into the meaning of the claim terms. *See, e.g., U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"). The inventor chose the term "monochromatic" to explain his invention, and the term literally means one color. He could have chosen to claim his invention by requiring the LEDs output light of a specific wavelength ranges, but he chose not to do so. Nothing in the '961 patent demonstrates a clear intent to narrow or otherwise alter or limit this clear and literal meaning of the term used to describe the invention. Nothing in the '961 patent, its specification, or its extensive file history supports defining this term as Feit proposes,

much less finding the term to be undefinable and indefinite. The Court should adopt CAO Lighting's proposed construction: monochromatic means one color.

**B.   "in said interior volume" (claim 1) / "in said base" (claim 33)**

| CAO Lighting's Position | Feit's Position |
|---|---|
| Ordinary meaning. No construction necessary. | Within the interior volume of said enclosure.<br>Within said base. |

Claim 1 recites, in relevant part, "an enclosure," "an interior volume within said enclosure," and "a heat sink located in said interior volume." Claim 33 recites, in relevant part, that the claimed light source "comprises a base to which said enclosure is mounted" and an AD/DC converter is positioned "*in* said base" (emphasis added). Feit submits that the word "in" needs to be construed by the Court. CAO Lighting believes the term "in"—a common word known to laypersons—is used in the claims in its ordinary way and needs no construction.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Vetsem Biopharma*, 2020 WL 5648353 at *2, *7 (term "inflammation" was not a technical term that a layperson could not understand and therefore did not need to be construed). Whether swapping "within" for "in" actually narrows the scope of the claims is unclear, but there is no need for the Court to re-define the claim term "in" as "within." The word "in" is clear and requires neither re-write nor revision.

In fact, it appear that Feit seeks not only to replace the term "in" with the term "within," but also add extraneous restrictions similarly (and erroneously) added by the Illinois District Court in the *Light Efficient Design* case. During claim construction exchanges, Feit initially proposed to restrict the meaning of "in" to "*entirely* within"

(emphasis added).  In subsequent claim construction exchanges, Feit dropped the word "entirely," but it does not appear to have abandoned the hope that the Court will implicitly add the word "entirely" to its construction of this term. In particular, these same terms ("in said interior volume" and "in said base") were construed by the Illinois District Court in the *Light Efficient Design* case as "within." Ex. 4 at 32. The Illinois District Court purported to interpret (and add to) its construction of these terms by adding asides suggesting that, for a component to be in (or within) a volume, it must and can only be entirely within it. For example, the Illinois District Court stated: "the claim should be given its plain meaning, which is that the heat sink is 'located in said interior volume'—*and nowhere else.*" Ex. 4 at 25 (emphasis added). Similarly, the court said that the plain meaning of "in said base" in claim 33 means "positioned *only* in the base." *Id.* at 28 (emphasis added).[3]

These comments by the Illinois District Court, however, were legal error. There is nothing in the plain meaning of "in" that restricts location to "entirely within." In fact, the Federal Circuit has rejected adding the restriction "entirely" to the claim term "in." In *Cannon Rubber Ltd. v. The First Years, Inc.*, 163 Fed. Appx. 870, 874-76 (Fed. Cir. 2005), the Federal Circuit addressed the plain meaning of the word "in" in the claim term "diaphragm disposed in the body." The Federal Circuit held the district court erred by improperly adding the limitation "entirely" in its construction of the term. *Id.* at 875. The Court succinctly said: "As an initial matter, we note that the term 'in' is a simple, non-technical term, and that under its ordinary meaning, a 'diaphragm disposed in the

---

[3] The Illinois District Court's analysis shows that it restricted the plain meaning of "in" by reference to the embodiment depicted in Figure 1 which, according to the court, "shows the heat sink located *completely within* the interior volume." Ex. 4 at 25 (emphasis added). It is, however, error to "import" a limitation from the specification into the claim rather than using the specification as context. *Teleflex v. Ficosa No. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002). Indeed, reading a limitation from the written description into the claims is "one of the cardinal sins of patent law." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). And, as discussed below, importing this element into the claims actually misreads the specification disclosure.

body' includes both diaphragms contained entirely and partially in the body." *Id*. The Court gave the example, "a trash bag is 'in' a trashcan even though a portion of it is hanging outside the trashcan." *Id*. Similarly, a person is "in" a bathtub or swimming pool even though part of that person's body may not be entirely submerged under water.

Thus, under *Cannon Rubber*, the claim limitation "a heat sink located ***in*** said interior volume" includes both heat sinks in the interior volume of the enclosure, even if some portion of the heat sink is also outside of the enclosure. *See also SignalQuest, Inc. v. Ten-Ming Chou*, No. 11-cv-392-JL, 2015 WL 471008, at *8 (D.N.H. Feb. 4, 2015) (rejecting proposed construction of term "disposed in" as "entirely located within" and adopting proffered reading of term as "at least partly inside" because "the plain and ordinary meaning of 'disposed in' does not require its subject to be 'entirely located'— or it might be said, 'subsumed'—within its object"). This comports with logic, experience and ordinary use: as the Federal Circuit have found, an object can be "in" (or "within") another structure without being entirely in (or within) it.

The Federal Circuit panel in *Cannon Rubber* also analyzed when one might be justified for deviating from the plain meaning of the term "in"—as Feit apparently proposes—noting that "we may depart from the plain meaning of a claim term when the patentee has acted as a lexicographer or when the patentee has clearly limited the scope of the invention through a disclaimer in the specification or prosecution history." *Cannon Rubber*, 163 Fed. Appx. at 875 (citing *Phillips*, 415 F.3d at 1316-17). Neither situation has occurred here. Dr. Cao has neither acted as a lexicographer re-defining the word "in" nor limited the plain meaning of that word through a disclaimer.

The word "in" appears 260 times in the '961 patent—but not a single use of the word "in" includes the further restriction "entirely" or "completely." In fact, the words "entirely" and "completely" are not used at all in the '961 patent at all. For example, the specification of the '961 Patent describes embodiments of the invention that include an enclosure 101 that encloses an interior volume 102. '961 patent, col. 3:9. The enclosure 101 may be mounted to a support 105, where the support 105 may be a separate

component or may be integral with a base 103. *Id.*, col. 3:15-17. The specification further states that the heat sink 104 may be mounted on the support 105 (*id.*, col. 3:32) or the base may serve as the heat sink (*id.*, col. 4:1-2). Thus, the heat sink "located in the interior volume" of the enclosure may be mounted to a support or may actually be the base—neither of which is required to be *entirely* within the interior volume of the enclosure.

Simply put, nothing in the '961 patent specification or prosecution history re-defines the plain meaning of the word "in." Nor is there any evidence of a disclaimer. Rather, the word "in" is consistently used in accordance with its plain meaning throughout the patent.

There is no need to construe this common term. If "within" means the same thing as "in" in Feit's proposed construction, there is no need for the substitution. *Ethicon*, 103 F.3d at 1568 (claim construction "is not an obligatory exercise in redundancy." ). And, if "within" is intended to mean something different (***entirely*** within), then, as discussed above, there is no basis to replace the word chosen by the inventor with a word with a different, more restrictive meaning. This Court should decline to interpret the word "in" as unnecessary.

## C.    "heat sink" (claim 1)

| CAO Lighting's Position | Feit's Position |
|---|---|
| A substance or device that absorbs or draws heat from another object. | An object that dissipates heat into the ambient environment. |

The parties agree that a heat sink is a structure or device that draws or dissipates heat away from something else. Feit, however, seeks to add the further requirement that a heat sink must dissipate heat into the ambient environment; this limitation is not supported by the '961 patent.

It is a well-known phenomenon that LEDs generate heat. The '961 patent notes that the use of prior art LEDs sufficient to generate high light intensity for general

14

illumination purposes can create "unmanageable amounts of heat. '961 patent, col. 1:27-28. To reduce the heat from LEDs, the heat sink of the invention "may be of any material capable of conducting heat away from the semiconductor devices." *Id.*, col. 3:53-54. The invention includes a heat sink "formed from a material which can dissipate heat." *Id.*, col. 8:16-18. The specification list multiple examples of heat sink materials (*id.*, col. 3:55-57, 9:1-7), but expressly allows that "heat sinks used in this invention can be of a variety of shapes and dimensions, such as those depicted in the drawings or any others which are useful for the structure of the particular light source being constructed" (*id.*, col. 9:30-34). The heat sink "may be of any desired shape depending on the application." *Id.*, col. 3:23-24. In short, any material with good heat conduction can be used as a heat sink in this invention. *Id.*, col. 9:6-7.

Simply put, the plain meaning of the term "heat sink" is a material that can dissipate heat or draw heat away from the LED chips in this context. The '961 patent applies precisely this plain meaning in its specification; it does not specify that the heat sink must dissipate heat into the "ambient environment" (a phrase that itself is unclear).[4] Dr. Cao did not act as a lexicographer and re-define "heat sink" to be restricted to dissipating heating in the ambient environment. In fact, the '961 patent does not even mention the word "ambient." Moreover, during reexamination, the USPTO found that certain prior art references disclosed heat sinks without any mention of "ambient environment." *See* Ex. 5 at CAO_DE_000771 ("Begemann discloses that the heat sink is made from metals and metal alloys, such as copper alloy, *for good heat conduction*." (Emphasis added)). Feit's construction thus adds unnecessary restrictions to the plain meaning of "heat sink" and should be rejected.

---

[4] "Ambient" typically means "relating to the immediate surroundings of something." *See* https://www.google.com/search?q=define+ambient (last performed June 27, 2021). What is the "ambient environment" for the heat sink? Anything that touches the heat sink? Other, more removed structures of the LED lighting product that surround the heat sink? The atmosphere outside the bulb? The plain meaning of "heat sink" should control; Feit's addition of unnecessary and un-recited words introduces confusion and will only foment future disputes.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    "a plurality of panels" (claim 1)

| CAO Lighting's Position | Feit's Position |
|---|---|
| Ordinary meaning. No construction necessary. | Multiple flat surfaces oriented at different angles. |

CAO Lighting agrees that "plurality" means more than one; the dispute appears to be over the scope of the word "panel." CAO Lighting believes the term "panel" is a common word easily understood by laypersons. Feit, again, seeks to limit the scope of the claim term by adding limitations and restrictions in an attempt to narrow the plain meaning. There is no justification for narrowing the plain meaning of "panels."

The term "panel" has no particular or specialized meaning and is not a technical term of art. It is a word that laypersons can understand in the context of this patent and does not need to be construed. *Vetstem Biopharma*, 2020 WL 5648353 at *7. *See also Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 2:09-cv-13-TS, 2011 WL 5546234, at *2 (D. Utah Nov. 14, 2011) (finding that the term "end panels" was plain and requires no further definition).

Feit ignores the ordinary meeting and attempts to limit the scope of the term to encompass only "flat" surfaces that are "oriented at different angles." Neither of these limitations is necessary or proper. The ordinary meaning of the word "panel" encompasses different shapes, sizes and placements. And, although panels certainly can be flat, there is no requirement that all panels must be flat. This is made clear by the '961 patent specification, which describes the heat sink of an embodiment as generally flat or planar, with "a plurality of generally flat or planar *panels*." '961 patent, col. 3:24-26 (emphasis added). If the claim term "panel"—by itself—meant flat or was restricted to flat surfaces, there would be no need to describe such "panels" as "generally flat or planar." In other words, the '961 patent's description of "panels" of one embodiment of the invention as "generally flat or planar panels" demonstrates that "panels" are not inherently that shape but can be other shapes. And the addition of the adjective

"generally" in the specification reinforces that even so-called "flat" panels need not be perfectly or entirely flat, as Feit apparently seeks to require.

The plain meaning of "panel" also indicates nothing about orientation, let alone orientation at different angles. This superfluous language is simply tacked on to Feit's proposed construction in order to limit the plain meaning of the claim term. There is no support for limiting "panels" in this manner in the intrinsic record.

A similar argument regarding the meaning of "panel" was rejected in the *Aqua Shield* case. In that case, the defendant proposed a construction of the claim term "paid of end panels" to require the panels be "quadrant shaped." 2011 WL 5546234, at *2. The plaintiff proposed that "end panels" be given its plain meaning. *Id.* The court rejected importing the "quadrant shaped" restriction into the plain meaning of "panels," and agreed that the term "is plain and requires no further definition." *Id.*

Feit's proposed construction is at odds with the ordinary meaning of the term. The Court should reject Feit's proposed construction and decline to construe the term in light of its plain meaning capable of being understood by laypersons.

### E.   "oriented to facilitate emission of light…in desired directions" (claim 1)

| CAO Lighting's Position | Feit's Position |
|---|---|
| Not indefinite. Ordinary meaning. No construction necessary. | 1. Indefinite as to "in desired directions"; or<br>2. Oriented to facilitate emission of light … in more than one direction. |

Feit contends this claim term is indefinite based apparently on the presence of the word "desired." Feit must show by clear and convincing evidence that the claim term cannot be understood by a person of ordinary skill in the art with "reasonable certainty" in the context of the entire patent. *Nautilus*, 572 U.S. at 910 (2014); *see also BASF*, 875 F.3d at 1365.

Like the other allegedly "indefinite" terms, the word "desired" is a common, ordinary word used in every-day discussions by engineers and lay persons alike. CAO is aware of no evidence that the term has some specialized meaning in the field of LED lights, and Feit has cited none to date. Rather, this term should be given its ordinary meaning that is clear from the claim language itself—*i.e.*, a semiconductor light source for emitting light "to illuminate a space used by humans." '961 patent, col. 9:52-53 (claim 1 preamble). *See RevoLaze LLC v. J.C. Penney Company, Inc.*, No. 2:19-cv-00043-JRG, 2020 WL 697891, at *9-11 (E.D. Tex. Feb. 11, 2020) (holding that claim terms "desired" and "undesired" were not indefinite but had the plain meaning of an intended result or effect as made clear in the claims); *Encap LLC v. Oldcastle Retail Inc.*, No. 11-c-808, 2012 WL 2339095, at *5 (E.D. Wis. June 19, 2012) (holding that term "desired amount" was not indefinite but had a plain meaning, read in context of the entire claim, as "an intended or predetermined quantity").

Dr. Cao did not use the word in any other manner in the '961 patent. He certainly did not specifically re-define the word "desired" or to limit its ordinary meaning. And there is no disclaimer of the word, or demonstration of any narrowing use of the word, in the prosecution history. Rather, the specification makes clear that "desired direction"—the intended result—is to illuminate spaces used by humans. For example:

- "the invention relates to semiconductor light sources and illumination devices useful for providing visible light in order to partially or fully illuminate a space occupied by or viewed by humans, such as residential space, commercial space, outdoor space, the interior or exterior of a vehicle, etc." ('961 patent, col. 1:9-12)
- "[i]t is an object of some embodiments of the invention to provide a semiconductor light source capable of illuminating a space with visible light" (*id.*, col. 1:56-58)
- "it is *desired* to illuminate a room with white light" (*id.*, col. 3:1-2) (emphasis added)

18

Feit's alternative construction that this claim limitation of "desired directions" requires the emission of light in more than one direction is an unwarranted restriction on the plain meaning of the claim term. In *Zadro Products, inc. v. Feit Electric Co., Inc.*, No. 20-cv-101-JVS (DFMx), 2021 WL 144247, *14 (C.D. Cal. Jan. 6, 2021), this Court rejected a similar attempt by Feit to restrict a claim term "light reflective surface, whose surface is oriented toward said light transmissive region" as requiring a specific orientation (i.e., directly across). Here, the plain meaning of "desired directions" certainly encompasses orienting the plurality of panels to facilitate the emission of light in one or multiple directions. Indeed, the '961 patent specification contemplates one specific direction: "The semiconductor device(s) 106 may be arranged in this embodiment of the invention to transmit light in all directions expect through the base 103, *or in a manner to direct light in a specific direction*." '961 patent, col. 3:39-42 (emphasis added).

The claim limitation "in desired directions" is not indefinite. It has a plain meaning as the desired directions, whether the intended result is to cast light in single direction or more than one direction, in order to illuminate a space; there is no need for further construction. *See RevoLaze*, 2020 WL 697891 at *11.

## F.    "a contact layer on which an electron may be mounted" (claim 7)

| CAO Lighting's Position | Feit's Position |
|---|---|
| Not indefinite. The term "electron" should be corrected as "electrode." No further construction needed. | Indefinite. |

This claim term contains an obvious typographical error: the word "electron" should read "electrode." District courts have the authority, within the claim construction process, to correct obvious errors in a patent claim. "It is well-settled law that, in a patent infringement suit, a district court may correct an obvious error in a patent claim." *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011).

Correction can be made if the error is not subject to reasonable debate, based upon the claim language and the patent specification, and the prosecution history does not suggest a different interpretation. *Pavo Solutions, LLC v. Kingston Technology Company, Inc.*, 2018 WL 5099486, at \*2 (C.D. Cal. 2018). *See also Cree, Inc. v. SemiLEDs Corp.*, 2012 WL 975697, \*14-15 (D. Del. 2012) (rejecting an indefiniteness argument and correcting typographical error in the claim language "wherein the metal contact forms *on* ohmic contact" with the word "an" instead of "on").

The use of "electron" is an obvious typographical error which is not subject to reasonable debate. First, persons of skill in the art would understand the claim should read "electrode" mounted on the contact layer. Dr. James Shealy, a Professor of Electrical Engineering at Cornell University, and an expert in LED chip design, describes this aspect of semiconductor structure as follows:

> 43.    LED's have a p-type contact layer located on top of the upper (second) cladding layer and an n-type contact layer, typically below the lower (first) cladding layer. This is the part of the semiconductor structure common to the LED chips used in the accused LED lighting sources that allows an electron to be placed in the conduction band state within the n-type contact layer in response to the application of electrical power to the LED chip. Similarly, an electron is removed from the valence band within the p-type contact layer in response to the application of electrical power to the LED chip. In semiconductors, such as LED chips, the absence of an electron in the valence band creates a net positive charge (referred to as a hole) representing the absent electron. The hole operates as a positive charge carrier.

> 44.    The LED has two electrodes which are metal layers mounted on the n-type and the p-type contact layers. When the LED chip is powered up in forward bias, electrons flow from the negative electrode (the cathode) into conduction band states in the n-type contact layer and holes flow from

the positive electrode (the anode) into valence band states in the p-type contact layer. These electrons diffuse through the n-type cladding layer into the active layer while the holes diffuse through the p-type cladding layer into the active layer. These excess electrons and excess holes recombine in the active region to produce light.

Ex. 3, Shealy Decl. at ¶¶ 43-44. Thus, a person of skill in the art would write the phrase "*electrode* may be mounted" rather than "*electron* may be mounted." *Id.* at ¶ 45. Furthermore, a person of ordinary skill in the art would understand that the claim to "a contact layer on which an *electron* is mounted" should be understood—and would be understood by persons of skill in the art, as made clear by the USPTO's understanding—to read "electrode" rather than "electron." *Id.*

The '961 patent specification does not suggest a different interpretation but instead makes clear the contact layer has an electrode mounted on it:

- "The contact layer 1207 has a positive electrode 1208 mounted on it…" '961 patent, col. 4:59-60.
- "A contact layer 1217 such as p+-GaN that has a positive electrode 1218 mounted on it." *Id.*, col. 5:20-22.
- "The contact layer may have one or more positive electrodes 1252*a* and 1252*b* mounted on it." *Id.*, col. 6:10-11.

The reexamination history also makes clear that the claim language contained a typo and should correctly be interpreted as "electrode" (not "electron"). The USPTO noted that "electron" was a typo—even writing "electron [sic.]"—and "assumed that the claim, instead, means 'electrode.'"[5] Ex. 6 at CAO_DE-004848. *See also* Ex. 5 at CAO_DE_000782-784, 788, 812. Based on that assumption, the USPTO found that a prior art reference to Suigura, as well as other prior art references, disclosed an electrode

---

[5] Even Feit, in this case, has assumed that the claim should read "electrode." In its invalidity charts, Feit points to the same prior art disclosing *electrodes*—not electrons—mounted on a contact layer.

mounted on a contact layer. Ex. 6 at CAO-DE_004848-4949; Ex. 5 at CAO_DE_000782-784, 788, 812.

Furthermore, changing the claim to substitute the word "electrode" will not, in any appreciable way, change the scope of claim. Ex. 3, Shealy Decl. at ¶ 45. It is more technically correct to say an electrode is mounted on the contact layer. However, the effect of an *electrode* mounted on a contact layer is to place an *electron* in the conduction band state of the n-type contact layer. *Id.* at ¶ 43. Thus, although unconventional in its terminology, the use of the word electron in the claim results in a claim with the same scope in all relevant respects as one that used the intended term (electrode). *Id.* at ¶ 45. *See also* Ex. 5 at CAO_DE_000782-784, 788, 812; Ex. 6 at CAO-DE_004848-4949.

The Court should reject Feit's indefiniteness argument and understand "electron" to mean "electrode"—as Feit, the United States Patent and Trademark Office, and persons of ordinary skill in the art do. No further construction is necessary.

### G. "reflective layers … serving to reflect light emitted by said active layer" (claim 8)

| CAO Lighting's Position | Feit's Position |
|---|---|
| Ordinary meaning. No construction necessary. | Distinct layers of material that reflect the majority of light emitted by said active layer. |

Feit again takes a common, ordinary word found in the claims—"layer"—and adds limitations in order to narrow the full scope of the claim. Nothing in the '961 patent purposefully limits the scope of the "reflective layer" term. Neither of the terms that Feit seeks to add to the claim—"distinct" and "majority of light" —even appear in the '961 patent specification.

This Court's claim construction opinion earlier this year in a case involving Feit is instructive. In *Zadro*, this Court rejected Feit's attempts to add restrictive limitations to the claim term "light reflective member." 2021 WL 144247 at *12. The Court first

22

rejected Feit's attempts to read additional restrictions into this term—Feit argued that the light reflective member must be effective in reflecting light obliquely from the illumination source to the opposition light transmission region of the mirror plates. *Id.* The Court also rejected Feit's argument that the claim term is restricted to only light reflective members that allow no light to pass through. *Id.* The Court found that both arguments were improper attempts to read limitations from the specification into the plain meaning of the term. *Id.* The Court finally rejected Feit's argument that "member" must be a separate structure. *Id.* The Court concluded that "light reflective" has the plain meaning of capable of reflecting light and therefore held that "the plain and ordinary meaning of this term is clear and no construction is necessary." *Id.*

The claim construction opinion in *Cree*, is also instructive on the "reflective layers" term. 2012 WL 975697 at *3-4. In *Cree*, the Delaware District Court considered the scope of the claim term "layer" found in a patent describing an LED-based general purpose light. *Id.* The Court rejected the defendant's proposed construction of "layer" as "a continuous thickness of matter spread over a surface." *Id.* at *3. The Court noted "the term 'continuous' does not appear anywhere within the patents and the Court is disinclined to read the limiting term of 'continuous' into the claims without justification in the specifications." *Id.* The court concluded that "layer" is "a common and non-technical term with a well-understood meaning." *Id.* at *4. Thus, "[b]ecause construction will not provide any additional clarity to the jury's decision making process, the Court will not construe 'layer' and will allow the jury to apply the ordinary meaning of the word." *Id.*

In this same case, the Delaware District Court also construed the term "reflector layer." After considering the positions of the parties, the Court refused to add any limitations to the claim term beyond its ordinary meaning, finding that a reflector layer is "a layer that reflects light generated by the active region of the LED." *Id.* at *4-5.

This plain meaning is, in fact, made clear in the precise claim language of claim 8 of the '961 patent: "said reflective layers serving to reflect light emitted by said active

23

layer." There is no need to further construe the plain meaning of this claim limitation—in other words, there is no need to further state that the reflective layers reflect light emitted by the active layer, since that language is already present in the claim.

Feit's attempt to unduly limit the scope of this clean term is also not consistent with the '961 patent specification: there is no mention of any "distinct" reflective layer or requirement that the layer reflect "the majority of light." Neither of these terms appears in the '961 patent and there is no justification to unduly restrict the full scope of this easy-to-understand claim term. The Court should reject Feit's proposed construction and find that no further construction is needed beyond the plain meaning of the claim language itself.

## VI. Conclusion

For the reasons set forth herein, the Court should reject Feit's indefiniteness assertions and adopt CAO Lighting's proposed constructions, including the plain and ordinary meaning of the claim terms and decline construction where unnecessary.

Dated:  June 28, 2021

**BARNES & THORNBURG LLP**

By:  */s/ Seth A. Gold*
Todd G. Vare
Paul B. Hunt
Jeff M. Barron
Seth A. Gold
Roya Rahmanpour
E. Sahara L. Williams
*Attorneys for Plaintiff* CAO Lighting, Inc.