Ryan D. Dykal (*Pro Hac Vice*)
rdykal@shb.com
Maxwell C. McGraw (*Pro Hac Vice*)
mmcgraw@shb.com
Mark Schafer (*Pro Hac Vice*)
mschafer@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547

Naoki Kaneko (SBN: 252285)
nkaneko@shb.com
Mayela C. Montenegro-Urch (SBN: 304471)
mmontenegro@shb.com
SHOOK, HARDY & BACON L.L.P.
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614
Telephone: 949-475-1500
Facsimile: 949-475-0016

Attorneys for Defendant
Feit Electric Company, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CAO LIGHTING, INC., <br><br> Plaintiff, <br><br> v. <br><br> FEIT ELECTRIC COMPANY, INC., | Case No. 2:20-cv-04926-AB-PJW <br><br> Judge: André Birotte Jr. <br> Ctrm:  7B <br><br> **DEFENDANT FEIT ELECTRIC COMPANY, INC.'S RESPONSE TO PLAINTIFF CAO LIGHTING, INC'S OPENING CLAIM CONSTRUCTION BRIEF** |

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants.

**Date**: Sept. 1, 2021
**Time**: 10:00 a.m.
**Location**: Courtroom 7B
Judge: Hon. André Birotte Jr.

# **TABLE OF CONTENTS**

**Page**

I.    Background and Overview of U.S. Patent 6,465,961 ....................................- 1 -

II.   Legal Standard................................................................................- 3 -

III.  Claim Terms and Proposed Constructions ......................................- 4 -

    A.  "monochromatic light" (claim 1)................................................- 4 -

    B. "in said interior volume" (claim 1) / "in said base" (claim 33)..................- 8 -

    C.  "heat sink" (claim 1)........................................................- 10 -

    D.  "a plurality of panels" (claim 1)...........................................- 13 -

    E.  "oriented to facilitate emission of light … in desired directions" (claim 1)..- 15 -

    F.  "a contact layer on which an electron may be mounted" (claim 7)........- 18 -

    G.  "reflective layers … serving to reflect light emitted by said active layer"
        (claim 8)................................................................- 21 -

IV.   Conclusion.......................................................................- 23 -

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 2:20-cv-04926-AB-PJW

1
2

# <u>TABLE OF AUTHORITIES</u>

3

**Cases**                                                      **Page(s)**

*Alloc, Inc. v. Int'l Trade Comm'n,*
   342 F.3d 1361 (Fed. Cir. 2003) ................................................................. 4

*Apple, Inc. v. Ameranth, Inc.,*
   842 F.3d 1229 (Fed. Cir. 2016) ............................................................... 6

*Aylus Networks, Inc. v. Apple Inc.,*
   856 F.3d 1353 (Fed. Cir. 2017) ............................................................... 4

*Azure Networks, LLC v. CSR PLC,*
   771 F.3d 1336 (Fed. Cir. 2014), *vacated on other grounds,* 575 U.S. 959 (2015). 4

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.,*
   262 F.3d 1258 (Fed. Cir. 2001) ............................................................... 3

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
   388 F.3d 858 (Fed. Cir. 2004) ............................................................ 3, 4

*Cannon Rubber Ltd. v. The First Years, Inc.,*
   163 Fed. Appx. 870 (Fed. Cir. 2005) ................................................. 7, 10

*CAO Lighting, Inc. v. Light Efficient Design,*
   No. 1:17-cv-07359, Dkt. 83 (N.D. Ill. April 3, 2019) ............................. 6, 7, 8, 9

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
   358 F.3d 1371 (Fed. Cir. 2004) ......................................................... 19, 20

*Datamize, LLC v. Plumtree Software, Inc.,*
   417 F.3d 1342 (Fed. Cir. 2005) (*abrogated on other grounds* in *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898 (2014))........................................ 16, 17, 18

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003)................................................................................ 20

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.,*
   64 F.3d 1553 (Fed. Cir. 1995) ................................................................ 6

*Fargo Elecs. v. Iris, Ltd.,*
   287 Fed. Appx. 96 (Fed Cir. 2008) ....................................................... 18

iv

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003) ............................................................. 7

*Gentry Gallery, Inc. v. Berkline Corp.*,
   134 F.3d 1473 (Fed. Cir. 1998) ........................................................... 10

*Gilead Scis., Inc. v. Watson Lab'ys, Inc.*,
   No. 15-cv-2350-RMB, 2016 WL 1690306 (D.N.J. Apr. 26, 2016)...................... 19

*Gillespie v. Dywidag Systems Intern., USA*,
   501 F.3d 1285 (Fed. Cir. 2007) ........................................................... 10

*Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc.*,
   839 F. App'x 500 (Fed. Cir. 2021) ....................................................... 20

*Krippelz v. Ford Motor Co.*,
   667 F.3d 1261 (Fed. Cir. 2012) ........................................................... 11

*Liberty Ammunition, Inc. v. United States*,
   835 F.3d 1388 (Fed. Cir. 2016) ............................................................. 7

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ............................................................. 6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014).............................................................. 16, 17, 18

*Novo Industries, L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003) ........................................................... 18

*Omega Engineering, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ........................................................... 10

*Pfaff v. Wells Elecs., Inc.*,
   525 U.S. 55 (1998).......................................................................... 20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................... 3, 4, 15

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006) ........................................................... 11

*Shire Dev., LLC v. Watson Pharm., Inc.*,
   787 F.3d 1359 (Fed. Cir. 2015) ........................................................... 11

v

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ..................................................................... 4

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ............................................................... 11

*Trs. of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) ............................................................... 20

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .................................................................. 4

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 2:20-cv-04926-AB-PJW

**LIST OF CITED EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| A | Declaration of Dr. Eric Bretschneider |
| B | Definition of "monochromatic light" from the Computer Science and Communications Dictionary, 2001 Edition |
| C | Definition of "monographic radiation" from the McGraw-Hill Dictionary of Electrical and Computer Engineering, 2003 |
| D | Definition of "monochromatic" from The New IEEE Standard Dictionary of Electrical and Electronics Terms, Fifth Edition, 1993 |
| E | Article "The Visible Spectrum", from Britannica.com |
| F | U.S. Patent No. 6,337,536 B1 titled "White Color Light Emitting Diode and Neutral Color Light Emitting Diode" dated January 8, 2002, with highlighted portions |
| G | U.S. Patent No. 6,746,885 B2 titled "Method for Making a Semiconductor Light Source." dated June 8, 2004 |
| H | July 10, 2013 Decision *Sua Sponte* to Merge Reexamination Proceedings in the *In re Densen Cao Inter Partes Reexamination* filed on August 6, 2012 and the *In re Densen Cao Inter Partes Reexamination* filed on September 13, 2012 for U.S. Patent No. 6,746,885 |
| I | March 29, 2016 Patent Owner's Rebuttal Brief in the *Merged Inter Partes Reexamination of U.S. Patent No. 6,746,885* |
| J | October 7, 2013 Amendment A and Response to Non-Final Office Action with Applicant Remarks in the *Reexamination of U.S. Patent No. 6,746,885* |

| K | Definition of "panel" from The Merriam-Webster Dictionary, New Edition, 2005 |
| L | Definition of "panel" from Paperback Oxford English Dictionary, Seventh Edition |
| M | Excerpted January 31, 2020 Report of Dr. James R. Shealy, Ph.D., Concerning Validity, CAO009029 |
| N | Pages from Color Science Concepts and Methods, Quantitative Data and Formulae, Second Edition, 2000 |
| O | Measuring Wavelength Discrimination Threshold Along the Entire Visible Spectrum by Adam Krudy and Karoly Ladunga, April 5, 2000 |
| P | Thermal Computations for Electronic Equipment by Gordon N. Ellison, 1984 |
| Q | Pages from High Brightness Light Emitting Diodes, Semiconductors and Semimetals, Volume 48, 1997 |
| R | Pages from Optoelectronics Applications Manual |
| S | Pages from Wakefield Catalog, Engineering Data |
| T | Definition of from Wiley Electrical and Electronics Engineering Dictionary, 2004 |
| U | Pages from Design and Analysis of Heat Sinks, 1995 |
| V | Pages from Number by Colors, A guide to Using Color to Understand Technical Data, 1997 |
| W | U.S. Patent No. 5,998,925 dated Dec. 7, 1999 with Certificates of Correction dated May 15, 2001, Nov. 13, 2001, Sept. 2, 2003 and May 18, 2010 |

Defendant Feit Electric Company, Inc. ("Feit Electric") responds to Plaintiff CAO Lighting, Inc.'s ("CAO") Opening Claim Construction Brief.

## I. Background and Overview of U.S. Patent 6,465,961

The '961 Patent was filed in August 2001 with the title, "Semiconductor Light Source Using a Heat Sink with a Plurality of Panels." True to its title, the '961 Patent discloses lighting devices with a particular type of heat sink: "The heat sink may have multiple panels for mounting chips in various orientations." Ex. 1, '961 Patent at Abstract. There are three figures in the '961 Patent depicting these heat sinks; each has panels at multiple angled orientations:



Fig. 1                     Fig. 2                     Fig. 6

*See id.* at 1:65–2:33 (Figures 1 and 2 depict "embodiment[s] of the present invention" that include heat sinks; Figure 3 depicts "a cross sectional view of a heat sink of the invention"). There are no other depictions of heat sinks in the '961 Patent. *See id.* (the other 21 figures depicting LED chips, chip packages, or the electronics).

When the '961 Patent first issued in October 2002, its claims required the following important aspects of the claimed invention: a "heat sink having a plurality of panels . . . oriented to facilitate emission of light from the semiconductor light source in desired directions." *Id.* at Claim 1. The claims also required a

1    monochromatic chip mounted on one of the panels, and "a coating for converting
2    monochromatic light emitted by said chip to white light." *Id.* at Claim 1.

3         That was the scope of the '961 Patent when CAO filed its first round of patent
4    lawsuits in the District of Utah in 2011. Those cases were quickly stayed when the
5    United States Patent and Trademark Office granted reexamination requests to
6    determine if the '961 Patent was invalid over various prior art references. In 2014, the
7    Patent Office decided that all of the originally issued claims of the '961 Patent were
8    indeed invalid.

9         CAO eventually convinced the Patent Office to re-issue the '961 Patent with a
10   new set of narrowed claims.[1] Those are the claims at issue in this suit. In addition to
11   a coated, monochromatic LED mounted on a multi-paneled heat sink, the claims now
12   require (1) the LED to include two "reflective layers" on opposite sides of an "active
13   layer," and (2) the LED to output light at "greater than 40 milliwatts." *See Id.* at Claim
14   21.[2]

15        The Detailed Description section of the '961 Patent contains three sections on
16   heat sinks, one section on an AC/DC converter, and twenty sections on various types
17   of LEDs. *See id.* at 2:4–46. Two of these sections describe LEDs having "reflective
18   layers." *Id.* at 5:24–53 and 5:61–6:11 (describing Figures 3f and 3h). Not
19   coincidentally, both of these "reflective layer" sections are expressly directed to
20   Vertical-Cavity Surface-Emitting Laser ("VCSEL") chips. *Id.* Which makes sense:
21   LEDs are typically designed to emit as much light as possible for efficiency; reflective
22   layers would defeat that goal. Ex. A, Bretschenider Dec. at ¶¶ 77-79, 86.  VCSEL

23
24   [1] The added claims were not reviewed in the petition for reexamination, and the
25   requestor did not have the opportunity to address those claims because, in accordance
     for the rules for reexamination, the requestor's participation in the reexamination ends
26   at the grant of the petition.
     [2] Claim 21 is a dependent claim and incorporates the elements from the claims from
27   which it depends (Claims 7 and 8), which were found unpatentable in the
28   reexamination.

chips, on the other hand, have "reflective layers" around the "active layer" to bounce light back-and-forth, creating a particular type of light emission: "Light emitted from the active layer reflects between the two reflective layers until it reaches an appropriate energy level and then lases, *emitting a laser beam of light*." Ex. 1, '961 Patent at 5:44–48 (emphasis added). While they are a specialized type of chips, CAO added this "reflective layer" limitation to overcome the prior art.

While CAO was forced to narrow its claims during reexamination, it now seeks broad constructions that encompass devices far beyond what the '961 Patent actually claims. For some terms, CAO overreaches so far that it risks invalidating its patent claims for indefiniteness. For others, CAO takes positions that would allow it to accuse *any* lighting device of infringement—ignoring the plain claim language that requires multi-paneled heat sinks, a monochromatic LED, and VCSEL-type reflective layers.

The Court should reject CAO's attempts to re-write the scope of the '961 Patent. As Feit Electric will show, the '961 Patent requires the "heat sink" to have panels at different orientations and to dissipate heat to the ambient environment, the monochromatic chip to emit light having a single wavelength (or narrow set of wavelengths), and the "reflective layers" to reflect a majority of light.

## II.    Legal Standard

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves,

1  the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard,*
2  *Inc.*, 388 F.3d at 861.

3      The general rule—subject to certain specific exceptions—is that each claim
4  term is construed according to its ordinary and accustomed meaning as understood by
5  one of ordinary skill in the art at the time of the invention in the context of the
6  patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d
7  1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347
8  (Fed. Cir. 2014), *vacated on other grounds,* 575 U.S. 959 (2015) ("There is a heavy
9  presumption that claim terms carry their accustomed meaning in the relevant
10  community at the relevant time."). One exception is that "a patentee may choose to
11  be his own lexicographer and use terms in a manner other than their ordinary meaning,
12  as long as the special definition of the term is clearly stated in the patent specification
13  or file history." *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir.
14  1996).  Another exception is that the patentee may have narrowed its claims by taking
15  certain positions before the Patent and Trademark Office ("PTO"). *Id.* at 1582; *see*
16  *also Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (Claims
17  cannot be "argued one way in order to maintain their patentability and in a different
18  way against accused infringers."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d
19  1570, 1576, 1676 (Fed. Cir. 1995) ("The prosecution history limits the interpretation
20  of claim terms so as to exclude any interpretation that was disclaimed during
21  prosecution.").

22  **III.   Claim Terms and Proposed Constructions**

23      **A.    "monochromatic light" (claim 1)**

24      CAO's proposed definition of "monochromatic light" impermissibly focuses
25  on the etymology of "monochromatic" rather than on what a person of ordinary skill
26  in the art would understand in view of the intrinsic and extrinsic evidence. *See*
27  *Phillips*, 415 F.3d at 1315. The fields of lighting, physics, electrical engineering, and

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No: 2:20-cv-04926-AB-PJW

materials science all agree with the intrinsic record: "monochromatic light" is a term of art that means "light of a single wavelength or narrow range of wavelengths."

The intrinsic record supports Feit Electric's proposed definition. Claim 1 of the '961 Patent requires a "coating for converting monochromatic light emitted by said chip to white light." Ex. 1, '961 Patent at 10:3-10. When the specification discusses this conversion, it equates "a single wavelength" with being "monochromatic":

> For example, *if light* from the light source 1002 *is a single wavelength*, then the light-altering coating 1004 may be phosphorous which will turn *the monochromatic light* into white light.

*Id.* at 8:48-8:55 (emphasis added). The specification consistently describes the light emitted by chips in terms of wavelength—not by the color perceived—and contrasts single wavelength light with multiple wavelength light:

> A thickness of phosphor 607 may be placed over the chip or array 604 in order to convert *single wavelength light emitted from the chip* or array *into multiple wavelength white light* useful for illumination of spaces used by humans. . . . The chip 6002 does not fill the entirety of the receptacle 6005 so a transparent filler 6003 of a material transparent to *the wavelength of light emitted by the chip* 6002 is provided. . . . On the face of the chip 6002 opposite the heat sink 6001 *a wavelength conversion coating* or layer 6004 is provided *to convert the light emitted by the chip to white light*.

*Id.* at 7:66-8:14 (emphasis added); *see also* Ex. A, Bretschneider Dec. at ¶¶ 62-64, 70-71. Even the portion of the specification cited by CAO describes light in terms of its wavelength: "Light which exits through the phosphor such as 5004 *a* will be converted *in wavelength* to white, making a useful light for illuminating physical spaces." Ex. 1, '961 Patent at 7:7-10; *see also* Ex. A, Bretschneider Dec. at ¶¶ 62-64,

70-71. Nothing in the '961 Patent specification describes "monochromatic light" in terms of the *color* that humans would perceive.[3]

CAO's proposed construction is wrong for other reasons. For instance, it would also violate the claim construction principle that courts "must give meaning to all the words in [the] claims." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995). Specifically, some claims require multiple LED chips that "are all configured to emit ***a same color*** of monochromatic visible light." *See* Ex. 1, Ex Parte Reexamination Certificate at 3:21-32 (claim 42), 6:42-52 (claim 77) (emphasis added). Under CAO's proposed construction, the term "monochromatic" would be superfluous by requiring the LEDs to emit a "same color" of "one color" of visible light. Construing claims in a manner that results in redundant terms is strongly disfavored. *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1238 (Fed. Cir. 2016) ("[C]onstruing a claim term to include features of that term that are already recited in the claims would make those expressly recited features redundant."); *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("[O]ur construction of 'about' eliminates the problem pointed out by Teva that the district court's construction of the term 'about' renders other parts of the claim superfluous.").

Finding no support for CAO's proposed construction in the claim language or specification, CAO relies heavily on the District of Illinois's prior construction. *See* Ex. 4, *CAO Lighting, Inc. v. Light Efficient Design*, No. 1:17-cv-07359, Dkt. 83, (N.D. Ill. April 3, 2019) ("the Illinois Court"). But this Court should assign no weight to

---

[3] CAO also cites the "Background" section to supposedly show a discussion of a *single color* of light. But that sentence addresses how a space used by humans could be illuminated, rather than the type of light emitted by LEDs. *See* Ex. 1, '961 Patent at 1:46-49. Indeed, the '961 Patent claims clearly require the light illuminating the human space to be *white light*. Consistent with this requirement, the Background Section never equates the "single color" of light with being "monochromatic."

6

that portion of the court's decision for several reasons. *First*, the Illinois Court's focus on how light is perceived by humans—rather than what is emitted from the chips—was erroneous. The claims never describe monochromatic light emitted by the chips in terms of how that light is perceived by humans. Construing the term in this manner is wrong because it would render the term indefinite: humans *only* perceive single colors of light from any particular source. As Dr. Bretschneider explains, humans perceive monochromatic light having a wavelength in the 580nm range as "yellow." Ex. A, Bretschneider Dec. at ¶¶ 61-62. But humans *also* perceive combinations of red light and green light as "yellow" due to the biology of their eyes. *Id*. Yet *that* yellow, despite being perceived by a human as light of a single color, actually comprises *multiple colors*, not "one color." Thus, focusing on how humans perceive light is incorrect. Even the '961 Patent acknowledges that humans perceive combinations of colors as a single color. *See* Ex. 1, '961 Patent at 6:58-7:4 ("The **combination of blue and yellow light** emitted by the chip according to arrows 5004a, 5004b and 5004c **will appear white to human eyes**.") (emphasis added); *see also* Ex. A, Bretschneider Decl. at ¶¶ 62-64, 70-71. This imprecision cannot be the correct construction in view of the intrinsic evidence. Ex. A, Bretschneider Decl. at ¶¶ 65-69. *See Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (rejecting proposed construction that would render the claim indefinite); *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395–97 (Fed. Cir. 2016) (construing a claim in a manner to avoid indefiniteness).

*Second*, the Court should not defer to the Illinois Court because the defendant there presented flawed arguments. In particular, Light Efficient Design *conceded* the plain meaning of "monochromatic," but argued that the "lexicographer exception" applied. Ex. 4, *Light Efficient Design*, No. 1:17-cv-07359, Dkt. 83 at 13–14. In contrast, Feit Electric argues that the plain and ordinary meaning of the term "monochromatic light" is "light of a single wavelength or narrow range of

7

wavelengths." The Court need not invoke the lexicographer exception to adopt Feit Electric's proposed construction.

*Third*, the Illinois Court erred by relying on a non-technical dictionary and CAO's uncorroborated expert testimony in defining "monochromatic." The extrinsic evidence in the appropriate scientific fields overwhelmingly supports Feit Electric's position. *See* Ex. A, Bretschneider Decl. at ¶¶ 61-74, Ex. V; *see also* Dykal Decl., Exs. B–E (dictionary definitions); *see also id.*, Ex. F, U.S. Patent No. 6,337,536 (highlighted sections discussing monochromatic lighting).

The '961 Patent consistently describes light according to its wavelength, and at one point explicitly equates light of a single wavelength with "monochromatic" light. Ex. 1, '961 Patent at 8:48-8:55. The extrinsic evidence is in agreement. The Court should adopt Feit Electric's proposed construction of "monochromatic light" to mean "light of a single wavelength or narrow range of wavelengths."

## B. "in said interior volume" (claim 1) / "in said base" (claim 33)

The term "in said interior volume" appears in Claim 1 of the '961 patent, and "in said base" appears in Claim 33. For these terms, CAO argues that no construction is necessary. But CAO's brief indicates that it intends to argue these terms to a jury in a manner inconsistent with the plain and ordinary meaning of "in." In particular, CAO argues that the heat sink and electronics do not have to be "entirely" or "completely" within the interior volume or base. That is, CAO wishes to argue to a jury that "in" means "partially in." This is not the plain meaning of "in," and this odd interpretation is not supported by the specification or any other evidence.

The specification describes the heat sink as being "within" the interior volume:

Located ***within the interior volume 102 is at least one heat sink 104***. . . . If the heat sink 104 may be mounted on a support 105, the support 105 may be designed in order to place the heat sink in the most desirable position ***within the interior volume*** 102 . . . .

Ex. 1, '961 Patent at 3:15–33 (emphasis added). This is consistent with the claims, which describe a heat sink as "in" an interior volume that is itself "within" the enclosure.

CAO's scant citations to the intrinsic record do not support its position. First, CAO quantifies the number of times the word "in" appears in the asserted patent. Dkt. 81 at 13. But CAO makes no attempt to tie this counting exercise to the location of the heat sink. Next, CAO cites a passage stating that a "heat sink 104 may be mounted on the support 105 or the base may serve as the heat sink"—arguing that this indicates the heat sink "may actually be the base." *Id.* at 14 (citing '961 Patent at 3:32, 4:1–2). But this is an incorrect conclusion: a heat sink "mounted to" the base may still be "within" the enclosure (particularly if the enclosure abuts the base, as is depicted in Figure 1, which CAO's passage is describing). CAO cannot point to any support in the specification showing the heat sink "partially in" the interior volume of the enclosure.

The intrinsic evidence actually supports Feit Electric's construction of "in said base." The only explicit depiction of the AC/DC electronics is Figure 11 (right), which depicts the components being completely within the base. While some other figures show the base, they do not show the electronics—implying that they are also completely within the base. *See* Ex. 1, '961 Patent at Figures 1 and 2.



Fig. 11

Finally, the Abstract states that "[a]n AC/DC converter may be included in the light source fitting," and the '961 Patent uses "fitting" synonymously with "base." *Id.* at 3:17–19. In light of this one-sided intrinsic evidence, the Illinois Court adopted the constructions proposed by Feit Electric. Ex. 4 at 23-29.

Rather than identify intrinsic evidence to support its position, CAO focuses on another case that declined to limit the term "in." *See generally* Dkt. 81 at 11–14 (citing

9

*Cannon Rubber Ltd. v. The First Years, Inc.*, 163 Fed. Appx. 870, 874–76 (Fed. Cir. 2005)). But that case is inapposite: in *Cannon Rubber*, the Federal Circuit found that the patent disclosed an embodiment where the diaphragm was "contained *partially within* the body of the pump." *Id.* CAO has identified no such embodiments in the '961 Patent.

Rather, as shown above, the '961 Patent exclusively describes heat sinks and AC/DC converters that are completely *within* the interior volume or the base, respectively. This case is more akin to *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998), where the patent exclusively discussed a "console" with controls being located between two recliners. *Id.* at 1474–75. The Federal Circuit noted the fundamental principle that "the scope of the right to exclude may be limited by a narrow disclosure" and limited the location of the controls because the specification only described them as being "in" the console. *Id.* at 1479–80.

The same principle applies here. Nothing in the '961 Patent shows the heat sink being anywhere other than "within" the interior volume of the enclosure, nor the AC/DC converter as being anywhere other than "within" the base. The Court should adopt Feit Electric's proposed constructions.

### C.    "heat sink" (claim 1)

CAO's proposed construction for "heat sink" contradicts the statements it made to the Patent Office when it sought to overcome prior art rejections. Feit Electric's proposed construction, on the other hand, is consistent with both the definition that CAO presented to the Patent Office, as well as how skilled artisans would understand the term.

It is fundamental that statements made to Patent Office can limit the scope of claims: "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Engineering,*

*Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323–24 (Fed. Cir. 2003); *see also Gillespie v. Dywidag Systems Intern., USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent."). Prosecution disclaimer often occurs "when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). This is true for statements made during reexamination proceedings and for prosecution of closely related patents. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue."); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) (A "patentee's statements during reexamination can be considered during claim construction, in keeping with the doctrine of prosecution disclaimer").[4]

In addition to the asserted '961 Patent, CAO owns U.S. Patent No. 6,746,885 (the "'885 patent"). The '961 and '885 patents are closely related, sharing an inventor, a filing date, and having ***identical specifications and drawings***. Like the claims of the '961 Patent, the '885 Patent claims recites a "heat sink" that draws heat away from semiconductor chips. *See* Ex. G, '885 Patent at 9:62–64, 10:46–49, 11:21–24, 11:32–34, 12:18–20, 12:31–34.

Like the '961 Patent, the '855 Patent was the subject of reexamination proceedings. *See, e.g.*, Ex. H, 7/10/2013 Decision Merging Proceedings. After the

---

[4] Even when statements in prosecution history do not result in disclaimer, they may still inform the meaning of the claim language by demonstrating how the inventor understood the invention. *See Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015) (explaining that prosecution history statements "do inform the claim construction," even when they "do not rise to the level of unmistakable disavowal").

'885 Patent claims were deemed invalid, CAO appealed, arguing that the prior art did not actually show a "heat sink." More specifically, CAO told the Patent Office that "[o]ne of ordinary skill in the LED lighting art would understand that a heat sink is *a passive heat exchanger that transfers the heat generated by an electronic or a mechanical device into a coolant fluid in motion*." Ex. I, 3/29/2016 Patent Owner's Rebuttal Brief at 2 (emphasis added). CAO further argued that the "heat sink" of the '885 Patent comported with this definition because it had "one surface for mounting semiconductor devices such as LEDs, and a second opposite surface *for flowing air to dissipate heat through convection*." *Id.* at 2–3 (emphasis added). CAO then distinguished its "heat sink" from those in the prior art, stating that the prior art "illustrates a closed space within the bulb" where "a heat steady state will be achieved in a short time" and "heat convection will hardly occur." *Id.* at 3.

In other words, CAO told the Patent Office that the "art-recognized" definition of a "heat sink" is an object (a passive heat exchanger) that dissipates heat (e.g., from electronics) into the ambient environment (as opposed to the closed space within the bulb). This is consistent with Feit Electric's proposed construction, and inconsistent with CAO's proposed construction.

CAO's proposed construction—"a substance or device that absorbs or draws heat from another object"—imposes no limitations at all. Indeed, *every* object absorbs or draws heat from hotter objects. That is an immutable consequence of the Second Law of Thermodynamics. Ex. A, Bretschneider Decl. at ¶¶ 39-60. Under CAO's proposal, it could accuse *anything* of being a "heat sink"—because every object draws heat from hotter objects. That is antithetical to the position CAO took during reexamination when trying to convince the Patent Office to re-issue its patent. In fact, CAO argued that various objects that could draw heat were *not* actually "heat sinks," such as circuit boards and metallic electrodes. *See* Ex. J, 10/7/2013 Office Action Response at 23–25. Likewise, CAO's proposed construction contradicts its arguments

to the Patent Office that "based on the art-recognized definition of heat sink, one of ordinary skill in the art would understand that the [copper alloy] substrate 3 of [a prior art reference] ***does not*** constitute a heat sink as the term is used and understood in the art." Ex. I, 3/29/2016 Patent Owner's Rebuttal Brief at 2 (emphasis added).

CAO makes no attempt to reconcile the specific, "art-recognized" definition of "heat sink" it advocated to the Patent Office with the unbounded definition it now proposes. The Court should reject CAO's proposed construction and adopt Feit Electric's, which is the definition CAO used during reexamination proceedings to wind its way around the prior art.

### D.    "a plurality of panels" (claim 1)

CAO does not dispute that "plurality" means more than one, but urges the Court to adopt a construction of "panels" that strips the term of any real meaning. Dkt. 81 at 16–17. The specification and prosecution history support Feit Electric's position that "a plurality of panels" means "multiple flat surfaces oriented at different angles."

Claim 1 recites "said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon, ***said panels*** on said heat sink ***being oriented to facilitate emission of light*** from the semiconductor light source ***in desired directions*** around the semiconductor light source." Ex. 1, '961 Patent at Claim 1. The claim thus clearly contemplates panels being oriented at different angles. Otherwise, the light would all be directed *in the same direction*, rather than in the desired *directions*. *See id.* (emphasis added).

The specification reinforces this claim language, stating that "[t]he heat sink may have multiple panels for mounting chips *in various orientations*." *Id.* at Abstract (emphasis added). The specification further states that "the heat sink 2204 has a plurality of heat sink faces 2210, 2211 and 2212 which are . . . *arranged in angular orientation with each other* in order to cause light from the LED's to be dispersed around a space to be illuminated." *Id.* at 4:14–22 (emphasis added). Every embodiment shown and described in the '961 Patent depicts panels as multiple flat surfaces arranged on the heat sink oriented at different angles:



Fig. 1          Fig. 2          Fig. 6

*Id.* at Figs. 1, 2, and 6. Even the Title and Abstract of the '961 Patent recite "a heat sink with a plurality of panels," and a heat sink with "multiple panels for mounting chips in various orientations." *Id.* at Title, Abstract.

In opposition, CAO argues that Feit Electric's inclusion of "flat surfaces" is antithetical to the plain meaning of "panels." But the portion of the specification that CAO cites actually cuts against it. *See* Dkt. 81 at 16 (quoting "[a]s depicted [in Fig. 1], the sink 104 has a generally flat or planar top 104a, and a plurality of generally flat or planar panels . . . ." '961 Patent, 3:22–26). CAO argues that because the word "panels" is preceded by "generally flat or planar," then "panels" must include other shapes because otherwise "there would be no need to describe such 'panels' as 'generally flat or planar.'" Dkt. 81 at 16. CAO's problem is that flat or planar panels

are the *only* panels described in the patent.[5] When a patentee exclusively describes panels as being flat or planar, the scope of the claimed invention has been clearly limited. *Phillips*, 415 F.3d 1303, 1316–17.

The extrinsic evidence also contradicts CAO's proposed construction. CAO concedes that "panel" is "not a technical term of art" before offering attorney argument that a layperson would understand that a "'panel' encompasses different shapes, sizes and placements." Dkt. 81 at 16. But if a layperson were to actually consult a dictionary, they would find the opposite. Merriam-Webster, for instance, defines a "panel" as "a flat piece of construction material" or "a flat piece of wood on which a picture is painted." Ex. K, MERRIAM-WEBSTER DICTIONARY (New Ed.), at 358 (2005). Similarly, the Oxford English dictionary defines a "panel" as "a flat board on which instruments or controls are fixed." Ex. L, PAPERBACK OXFORD ENGLISH DICTIONARY (7th Ed.), at 518 (2012). CAO cites no extrinsic evidence to support its purported "ordinary meaning," and its attorney argument should be disregarded.

The Court should heed the specification and extrinsic evidence and adopt Feit Electric's proposed construction of "plurality of panels" as "multiple flat surfaces oriented at different angles."

## E.    "oriented to facilitate emission of light … in desired directions" (claim 1)

Claim 1 of the asserted patent recites panels on a heat sink that are "*oriented to facilitate emission of light* from the semiconductor light source *in desired directions*." Ex. 1, '961 Patent, Claim 1. The phrase "in desired directions" is indefinite because it provides no objective way to measure the claims, and therefore fails to "inform

---

[5] The word "panels" is only mentioned twice in the '961 Patent: (1) in the Abstract (where no shape is defined); and (2) in the above citation, where the panels are disclosed as "flat or planar." Figures 1, 2, and 6 likewise only depict "flat or planar" panels. CAO's citation to a sentence stating that the *heat sink* may have curved or round *sides* does not speak to the shape and orientations of the *panels*.

those skilled in the art about the scope of the invention with reasonable certainty."
*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

To analyze whether a subjective phrase like "desired directions" is indefinite,
courts "must determine whether the patent's specification supplies some standard for
measuring the scope of the phrase." *Datamize, LLC v. Plumtree Software, Inc.*, 417
F.3d 1342, 1351 (Fed. Cir. 2005) (*abrogated on other grounds* in *Nautilus, Inc. v.
Biosig Instruments, Inc.*, 572 U.S. 898 (2014)). There is no standard set forth in the
'961 Patent to determine whether a lighting source meets the "in desired directions"
limitation.

The *Datamize* case is illustrative of why this term is indefinite. The *Datamize*
claims required items to be presented on a screen in a "desired uniform and
aesthetically pleasing look and feel . . . ." *Id*. at 1344–1345. The patentee argued that
"the phrase 'aesthetically pleasing' applies to the process of defining a 'desired'
result," and that to infringe, a person must simply "intend to create an 'aesthetically
pleasing' interface screen." *Id*. at 1349. The Federal Circuit rejected this, finding that
the term was "completely dependent on a person's subjective opinion," and that "the
scope of claim language cannot depend solely on the unrestrained, subjective opinion
of a particular individual purportedly practicing the invention." *Id.* at 1350. The
Federal Circuit also found that neither the claims, the specification, nor the
prosecution history provided "any meaningful definition for the phrase," and thus one
of ordinary skill in the art would have no way to determine whether something
infringed. *Id.* at 1349.

The *Datamize* court's rationale applies equally to this case. The '961 Patent
can only be infringed if the panels are oriented to emit light in "desired directions."
But CAO has offered no objective definition of what "desired directions" means.
Thus, one of skill in the art has no way to determine whether orienting panels in any
particular direction satisfies the "desired direction" limitation. Instead, CAO attempts

1    to eliminate the requirement altogether, arguing that "desired directions" simply

2    means that light is emitted "in one or multiple directions." Dkt. 81 at 19. But that is

3    no limitation at all: if light is emitted, it must go in either "one direction" or "multiple

4    directions." Similarly, CAO argues that "in desired directions" simply means that the

5    semiconductors "illuminate a space used by humans." But that is also an attempt to

6    simply remove the offending term: claim 1 *already* requires the device to "illuminate

7    a space used by humans." If that is all "desired directions" means, the term is

8    superfluous.

9        The *Datamize* court expressly rejected attempts like these to clarify claim scope

10    by removing an indefinite term. *Id.* at 1355 ("We would subvert the definiteness

11    requirement if we allowed a word to be eliminated from a phrase when the phrase

12    cannot be given a reasonable meaning except in the absence of that word."). Also like

13    the patent in *Datamize,* the '961 Patent specification fails to provide any objective

14    guidance as to what "desired directions" means. This ambiguity renders this claim

15    term impermissibly indefinite. *See, e.g.*, *Nautilus*, 572 U.S. at 908–10 ("[A] patent

16    must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing]

17    the public of what is still open to them.'").

18        The cases cited by CAO are readily distinguishable. In *RevoLaze LLC v. J.C.

19    Penney Company, Inc.*, the claims and specification discussed what the "desired"

20    claim elements were—and also what the "undesired" elements were. No. 2:19-cv-

21    00043-JRG, 2020 WL 697891, at **7, 9–11 (E.D. Tex. Feb. 11, 2020). The court

22    therefore found the term definite because the term "desired" meant something that

23    met the "predetermined pattern"—which was objective and not simply "the vagaries

24    of any person's opinion." *Id.* at *11. Similarly, in *Encap LLC v. Oldcastle Retail Inc.*,

25    the court found that "desired amount" was not indefinite because the claims and

26    specification shows that it meant "an intended or pre-determined amount." No. 11-c-

27    808, 2012 WL 2339095, at *5 (E.D. Wis. June 19, 2012). Thus, a person could know

28

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No: 2:20-cv-04926-AB-PJW

1    they were infringing if they set a pre-determined amount, and then that amount was

2    dispensed—again, an objective determination. *Id.* Unlike those cases, the claims and

3    specification of the '961 Patent provide no boundaries on what "desired directions"

4    means. There is thus no way to objectively determine if a panel arrangement infringes.

5    The Court should find this term indefinite. *See Datamize*, 417 F.3d 1342, 1352–53.

6        If the Court finds that this claim term is not indefinite, it should adopt Feit

7    Electric's alternative construction of "in more than one direction." CAO's argument

8    that "desired directions" may mean "one" direction contradicts the claims themselves,

9    which plainly require "desired *directions*." *See* Ex. 1, '961 Patent at Claim 1

10    (emphasis added). The one specification statement cited

11    by CAO—"[t]he semiconductor devices(s) 106 may be

12    arranged in this embodiment of the invention to transmit

13    light . . . in a manner to direct light *in a specific*

14    *direction*"—refers to how *each* panel of Figure 1 (right)

15    may be oriented to direct light in a particular direction.

16    When taken as a group—as contemplated by the claims—



Fig. 1

17    it is clear that the depicted LEDs are angled to emit light in *multiple* direction*s*.

18        **F.    "a contact layer on which an electron may be mounted" (claim 7)**

19        CAO argues that this phrase contains an "obvious" typographical error, and

20    that "electron" should be judicially corrected to "electrode." But CAO cannot satisfy

21    the requirements for judicial correction.

22        Judicial correction is proper "only if (1) the correction is not subject to

23    reasonable debate based on consideration of the claim language and the specification

24    and (2) the prosecution history does not suggest a different interpretation of the

25    claims." *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir.

26    2003). Further, the error "must be evident on the face of the patent." *Fargo Elecs. v.*

27    *Iris, Ltd.*, 287 Fed. Appx. 96, 102 (Fed Cir. 2008). "[C]ourts may not redraft claims,

28

whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). The Federal Circuit has advised that judicial correction is a "narrow remedy to be used sparingly." *Gilead Scis., Inc. v. Watson Lab'ys, Inc.*, No. 15-cv-2350-RMB, 2016 WL 1690306, at *2 (D.N.J. Apr. 26, 2016) (citing *Novo Industries*, 350 F.3d at 1358). Therefore, "[judicial correction] is the exception, not the rule, and should be employed only to correct an error that is so obvious that there is no question as to the proper correction." *Id.* (citing *Novo Industries*, 350 F.3d at 1358).

Here, there is at least "reasonable debate" about whether "electron" is the correct term. Indeed, while CAO's expert Dr. Shealy now claims "electron" is an obvious typographical error and should have read "electrode," this same expert opined in one of CAO's previous cases that the term "electron" in claim 7 of the '961 Patent would make *more* sense than the term "electrode":

> The examiner therefore assumed that the claim term [electron] instead should mean "electrode". However, to a person of skill in the art, the term "mounted" (as used in the claim, "a contact layer on which an electron may be mounted for powering said chip") can mean "put into position for use" or "setup," which is technically correct although not the most common terminology. I also note that an electron is a sub-atomic particle. ***I further note that the electrode is usually used by one skilled in the art to describe the ohmic metallizations, not the contact layer***.

Ex. M, Shealy Report on Validity of the '961 Patent in Light Efficient Design, ¶ 118 (emphasis added). CAO cannot reconcile its expert's conflicting opinions, and the Court should decline to "redraft [this claim . . . to make [it] operable or to sustain [its] validity." *Chef Am.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

Furthermore, if CAO truly believed the word "electron" was an obvious

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No: 2:20-cv-04926-AB-PJW

typographical error, it should explain why it declined to seek correction over the twenty years it has been prosecuting and litigating the '961 Patent. *See* MPEP §§ 1481 (providing means for a patentee to correct clerical or typographical errors with the Patent Office). CAO has had numerous invitations to seek correction—including when it was prosecuting the '961 Patent, during the nine years from issuance until it filed its first litigations, during the Utah Litigations filed in 2011, during the multiple reexamination proceedings it fought from 2012 to 2017, and during the period from 2017 until 2020 when it filed the present suit. Only now that Feit Electric has pointed out the impossibility of "mounting" a subatomic particle does CAO seek correction. The Court should reject CAO's belated attempt to alter the scope of its claims.[6]

A literal reading of this phrase, as written, is an impossibility. As Feit Electric's expert explains, electrons are subatomic particles, and it is not possible to "mount" one on a contact layer. *See* Ex. A, Bretschneider Decl. at ¶¶ 75-76. Claiming an impossibility or nonsensical result renders a patent claim indefinite. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1366–67 (Fed. Cir. 2016) (holding claims indefinite that were "nonsensical in the way a claim to extracting orange juice from apples would be"); *Chef Am., Inc.*, 358 F.3d at 1374 ("Even a nonsensical result does not require the court to redraft the claims of the [patent].") (internal quotation marks omitted); *Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys Inc.*, 839 F. App'x 500, 505 (Fed. Cir. 2021) (finding that when "[r]eading the claim literally, a dose form,

---

[6] The '961 Patent is near the end of life, expiring next month. It would be extraordinary for the '961 Patent to be judicially corrected at or past its end of life, and would subvert the notice requirement of the patent system. *See Eldred v. Ashcroft*, 537 U.S. 186, 225–26 (2003) ("The issuance of a patent is appropriately regarded as a *quid pro quo*—the grant of a limited right for the inventor's disclosure and subsequent contribution to the public domain."); *see also Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998) ("[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.").

20

which is an inanimate object, cannot set a goal," and just because "the proper construction of the claims is nonsensical does not warrant judicial redrafting of the claims").

The Court should decline CAO's request to correct its patent claims given the substantial debate over whether "electrode" is the obviously correct term. And because it is impossible to "mount" an electron, the Court should find claim 7 indefinite.

### G.    "reflective layers … serving to reflect light emitted by said active layer" (claim 8)

CAO argues that "reflective layer" is an "easy-to-understand" term and therefore no construction is necessary. But CAO's construction would remove the requirement entirely. As Feit Electric's expert explains, the laws of physics dictate that *everything* possesses some amount of reflectivity. Ex. A, Bretschneider Decl. at ¶ 77. That is not the proper scope of the '961 Patent, and certainly is not how the '961 Patent describes "reflective layers."

The only portions of the specification that use the term "reflective layers" are addressed to VSCEL chips. *See* Ex. 1, '961 Patent at 5:31–6:11. As the specification explains, in these laser-type LEDs, "[l]ight emitted from the active layer reflects between the two reflective layers until it reaches an appropriate energy level and then lases, emitting a laser beam of light." *Id.* at 5:44–48. Thus, the "reflective layers" are not merely something that has *some* amount of reflectivity. That would render the term meaningless, as every physical object possesses some reflectivity—even materials specifically designed to *not* be reflective. Ex. A, Bretchneider Decl. at ¶¶ 77-79. Rather, the "reflective layers" of the '961 Patent are show to be *distinct layers* that reflect *a majority of light*—enabling the VSCEL chips to "lase." *See id.* at ¶¶ 80-87 (VSCEL chips require "exceptionally high reflectivity . . . greater than 90%").

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No: 2:20-cv-04926-AB-PJW

The '961 Patent drawings consistently depict the VCSEL "reflective layers" as distinct layers surrounding the "active" layers. Ex. 1, '961 Patent at Fig. 3f (right, reflective layers highlighted). This exclusive usage by the '961 Patent specification comports with Feit Electric's proposed construction.



Fig. 3f

CAO's reliance on claim construction orders from other cases is misplaced. In *Zadro Products, Inc. v. Feit Electric Co., Inc.*, the asserted patent described the "light reflective member" simply as something that reflected light. No. SAVC 20-101 JVS (DFMx), 2021 WL 144247, *12 (C.D. Cal. Jan. 6, 2021).[7] That is not the case here, where the only portions of the specification that discuss "reflective layers" describe VSCEL chips and depict distinct layers with substantial reflectivity.

*Cree, Inc. v. SemiLEDs Corp.* is similarly unavailing. There, the court found that the term "layer" should be given its plain and ordinary meaning. No. 10-866-RGA, 2012 WL 975697, at **3–4 (D. Del. Mar. 21, 2012). That is because the disclosure in the patent merely discussed the overall thickness of the layer. *Id.* Unlike that case, every use of the word "layer" in the '961 Patent specification depicts highly distinct "layers" that form the LED chips. *See* Ex. 1, '961 Patent at Figs. 3b, 3d, 3f, 3h, 5a, 5b, and their descriptions at 4:38–63, 5:9–23, 5:31–53, 5:61–6:11, and 6:56–7:14. Further, the *Cree* court rejected defendants proposed construction—"a layer of material with a reflective surface"—because it was not tied to the functionality of the

---

[7] The *Zadro* case involved structure of a lighted mirror visible to the naked eye. Here, the structures referenced in the '961 patent involve microscopic and sub-microscopic structures in a semiconductor device.

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No: 2:20-cv-04926-AB-PJW

layers. *Cree* at \*\*3–4. Here, Feit Electric's proposed construction is directly tied to the function of the "reflective layers"—a term that is used exclusively when describing VSCEL chips, which require distinct layers that reflect a substantial amount of light.

The Court should adopt Feit Electric's proposed construction of "distinct layers of material that reflect the majority of light emitted by said active layer."

## IV.    Conclusion

For the reasons set forth herein, the court should adopt Feit Electric's proposed constructions.

Dated: July 20, 2021.                          Respectfully submitted,

                                               SHOOK, HARDY & BACON L.L.P.


                                               By: */s/   Ryan D. Dykal*
                                                       Ryan D. Dykal
                                                       Mark D. Schafer
                                                       Maxwell C. McGraw
                                                       Naoki Kaneko
                                                       Mayela C. Montenegro-Urch
                                               Attorneys for Defendant
                                               Feit Electric Company, Inc.

DEFENDANT FEIT ELECTRIC'S RESPONSE TO CAO'S OPENING CLAIM CONSTRUCTION BRIEF
Case No: 2:20-cv-04926-AB-PJW

## **PROOF OF SERVICE**

I am employed in the County of Jackson, State of Missouri.  I am over the age of 18 and not a party to the within action.  My business address is 2555 Grand Boulevard, Kansas City, MO 64108.

On July 19, 2021, I served on the interested parties in said action the within:

**DEFENDANT FEIT ELECTRIC COMPANY, INC.'S RESPONSE TO PLAINTIFF CAO LIGHTING, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

☐  (MAIL) By placing a true copy thereof in a sealed envelope(s) addressed as stated on the attached mailing list.  I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐  (BY ELECTRONIC SERVICE) By electronically mailing a true and correct copy through Shook, Hardy & Bacon L.L.P.'s electronic mail system to the e-mail address(es) as stated on the attached service list.

☒  (ELECTRONIC FILING) I provided the document(s) listed above electronically through the CM/ECF system pursuant to the instructions set forth in the Local Rules for the United States District Court for the Central District of California.

I declare under penalty of perjury under the laws of the State of Missouri and the United States of America that the foregoing is true and correct.

Executed on July 19, 2021, at Kansas City, Missouri.


_____          _/s/ Patrisha Carlyle_____
        Patrisha Carlyle                                        /s/ Patrisha Carlyle
     (Type or print name)                                   (Signature)

## SERVICE LIST

### *(CAO Lighting, Inc. v. Feit Electric Company, Inc.)*

Seth A. Gold
Roya Rahmanpour
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, CA 90067

Tel: (310) 284-3880
Fax: (310) 284-3894
Email: Seth.Gold@btlaw.com
Roya.Rahmanpour@btlaw.com
**Attorneys for Plaintiff**
**CAO Lighting, Inc.**

Todd G. Vare (*pro hac vice*)
Paul B. Hunt (*pro hac vice*)
BARNES & THORNBURG LLP
11 South Meridian St.
Indianapolis, N  46204

Tel: (317) 236-1313; (317) 231-7495;
Fax: (317) 231-7433
Email: todd.vare@btlaw.com
phunt@btlaw.com
**Attorneys for Plaintiff**
**CAO Lighting, Inc.**

E. Sahara L. Williams (*Pro Hac Vice*)
Jeffrey M. Barron *(Pro Hac Vice)*
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN  46204

Tel: (317) 231-6407; (317) 231-7751
Fax: (317) 231-7433
Email:  Sahara.Williams@btlaw.com
Jeff.Barron@btlaw.com
**Co-counsel for Plaintiff**
**CAO Lighting, Inc.**