Seth A. Gold (SBN 163220)
*Seth.Gold@btlaw.com*
Roya Rahmanpour (SBN 285076)
*Roya.Rahmanpour@btlaw.com*
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone:   (310) 284-3880
Facsimile:    (310) 284-3894

Todd G. Vare (*Admitted pro hac vice*)
*Todd.Vare@btlaw.com*
Paul B. Hunt (*Admitted pro hac vice*)
*Paul.Hunt@btlaw.com*
Jeff M. Barron (*Admitted pro hac vice*)
*Jeff.Barron@btlaw.com*
E. Sahara L. Williams (*Admitted pro hac vice*)
*Sahara.Williams@btlaw.com*
**BARNES & THORNBURG LLP**
11 S. Meridian Street
Indianapolis, IN 46204
Telephone:  (317) 236-1313
Facsimile:  (317) 231-7433

*Attorneys for Plaintiff* CAO Lighting, Inc.

# IN THE UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAO LIGHTING, INC., | Case No.: 2:20-cv-04926-AB-SP |
| Plaintiff, | [Assigned to the Hon. André Birotte Jr.] |
| v. | **PLAINTIFF CAO LIGHTING, INC.'S REPLY CLAIM CONSTRUCTION BRIEF** |
| FEIT ELECTRIC COMPANY, INC., a California corporation | |
| Defendant. | **Hearing Date**: Sept. 1, 2021<br>**Hearing Time**: 10:00 a.m.<br>**Location**: Courtroom 7B |

# **TABLE OF CONTENTS**

**Page**

I.   Introduction.................................................................................................1

II.  Argument ..................................................................................................2

   A.   "monochromatic light" ......................................................................2

   B.   "in said interior volume" / "in said base"..........................................5

   C.   "heat sink" .........................................................................................6

   D.   "a plurality of panels".......................................................................8

   E.   "oriented to facilitate emission of light … in desired directions".....9

   F.   "a contact layer on which an electron may be mounted".................11

   G.   "reflective layers … to reflect light emitted by said active layer".................13

III. Conclusion ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Audionix Sys., Inc. v. AAMP of Fla., Inc.*,
  No. 12-cv-10763-MMM-JEMX, 2013 WL 9602634 (C.D. Cal. Sept. 12, 2013) ............................................................................................................2

*Aventis Pharma S.A. v. Hospira, Inc.*,
  675 F.3d 1324 (Fed. Cir. 2012) ............................................................... 1, 14

*Cree, Inc. v. SemiLEDs Corp.*,
  2012 WL 975697 (D. Del. Mar. 21, 2012) .......................................... 14, 15

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005), *abrogated by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ................................................. 9, 10

*Ethicon LLC v. Intuitive Surgical, Inc.*,
  847 Fed. App'x. 901 (Fed. Cir. Mar. 15, 2021) .........................................1

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ...................................................................2

*H. Lundbeck A/S v. Apotex Inc.*,
  No. 18-cv-88-LPS, 2020 WL 777210 (D. Del. Feb. 18, 2020) ................. 10

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999) ....................................................... 1, 2, 5, 7

*Linear Tech. Corp. v. Int'l. Trade Com'n*,
  556 F.3d 1049 (Fed. Cir. 2009) ................................................................ 15

*MBO Labs., Inc. v. Becton Dickinson & Co.*,
  474 F.3d 1323 (Fed. Cir. 2007) ............................................................ 1, 7

*Motiva Patents, LLC v. Sony Corp.*,
  No. 9:18-cv-180-JRG-KFG, 2019 WL 3933670 (E.D. Tex. Aug. 20, 2019) ............................................................................................................6

*Power Integrations, Inc. v. ON Semiconductor Corp.*,
  396 F. Supp. 3d 851 (N.D. Cal. 2019) .......................................................6

ii

*Skedco, Inc. v. Strategic Operations, Inc.*,
  685 Fed. App'x. 956 (Fed. Cir. 2017) ......................................................... 15

*Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) .................................................................. 10

*Thorner v. Sony Computer Entertainment America L.L.C.*,
  669 F.3d 1362 (Fed. Cir. 2012) ................................................................... 1

*Vertical Tank, Inc. v. BakerCorp.*,
  No. 1:18-cv-145-LJO-JLT, 2019 WL 2207668 (E.D. Cal. May 22,
  2019) ............................................................................................................. 7

*Zadro Prods., Inc. v. Feit Electric Co., Inc.*,
  No 20-cv-101-JVS, 2021 WL 144247 (C.D. Cal. Jan. 6, 2021) ................. 14

## LIST OF CITED EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 (Dkt. 81-2) | U.S. Patent No. 6,465,961 (including *Ex Parte* Reexamination Certificate) |
| 2 (Dkt. 81-3) | June 16, 2021 Draft Joint Claim Construction Chart |
| 3 (Dkt. 81-4) | Declaration of James R. Shealy |
| 4 (Dkt. 81-5) | April 3, 2019 Memorandum Opinion, Dkt. 83, *CAO Lighting, Inc. v. Light Efficient Design*, No. 17-cv-7359, U.S. District Court for the Northern District of Illinois. |
| 5 (Dkt. 81-6) | January 2, 2014 Non-Final Action, *Inter Partes* Reexamination, Control No. 95-000680 |
| 6 (Dkt. 81-7) | January 23, 2014 Non-Final Action, *Ex Parte* Reexamination, Control No. 90-012597 |
| 7 (Dkt. 81-8) | *Ex Parte* Reexamination Certificate, U.S. Patent No. 6,465,961, Dated Sept. 2, 2014 |
| 8 (Dkt. 81-8) | *Inter Partes* Reexamination Certificate, U.S. Patent No. 6,465,961, dated May 11, 2017 |
| 9 | Reply Declaration of James R. Shealy, Ph.D. |
| 10 | August 31, 2016 Patent Trial and Appeal Board Decision Affirming Examiner |
| 11 | Excerpted Declaration of Eric Bretschneider, Dkt. 116, *Optolum, Inc. v. Cree, Inc.*, No. 1:17-cv-687-WO-JLW, U.S. District Court for the Middle District of North Carolina |

## I.     Introduction

Feit recites, but then ignores or violates claim construction principles—as if merely incanting the law, rather than applying it, is sufficient. For nearly every claim term in dispute, Feit seeks to import limitations from embodiments or drawings into the construction of the claim terms that, on their face, have a plain and ordinary meaning. But "a court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). A claim may be narrowed beyond its plain and ordinary meaning: "1) when a patentee sets out a definition and acts as [its] own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entertainment America L.L.C.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). This is a "stringent standard" and Feit simply fails to meet it.

Thus, Feit's proposed claim constructions based on repeated references to the embodiments in the '961 patent specification invite error. General descriptions of the characteristics of embodiments do not limit the claims. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012). "It is … not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Thorner*, 669 F.3d at 1366; *see also Ethicon LLC v. Intuitive Surgical, Inc.*, 847 Fed. App'x. 901, 907 (Fed. Cir. 2021) ("[T]he fact that every embodiment in the specification depicts a particular arrangement or structure does not necessarily support reading that arrangement or structure into the claims absent express claim language requiring as much.").

Similarly, Feit's arguments based on references to structural arrangements in the patent figures must be rejected. Absent some clear disclaimer, the plain and ordinary meaning of claim terms cannot be limited by what is drawn in the figures. *MBO Labs., Inc. v. Becton Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("The patent figures all depict the flange connected mainly to the outside, *but patent coverage is not*

---

1

*necessarily limited to inventions that look like the ... figures*") (emphasis added); *see also Gart v. Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001) ("[D]rawings are not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims.").

Feit's attempt to add modifiers to otherwise broad claim terms having plain and ordinary meaning also is improper. "General descriptive terms will ordinarily be given their full meaning; *modifiers will not be added to broad terms standing alone.*" *Johnson Worldwide Associates*, 175 F.3d at 989 (emphasis added); *see also Audionix Sys., Inc. v. AAMP of Fla., Inc.*, No. 12-cv-10763-MMM-JEMX, 2013 WL 9602634, *14 (C.D. Cal. Sept. 12, 2013) (declining to limit the claim term "memory" to "non-volatile memory" because doing so would "commit one of the cardinal sins of patent law—reading a limitation from the written description into the claims").

## II. Argument

### A. "monochromatic light"

Feit never challenges the fact that the literal meaning of "monochromatic" is "one color."[1] At no point does Feit show that the intrinsic record of the '961 patent unambiguously demonstrates a disavowal of claim scope or re-definition of the ordinary meaning of the term.

Feit's reliance on a few instances in which the '961 patent uses the term "wavelength" cannot equate "monochromatic light" with "a single wavelength." Visible light is light perceived by humans in the wavelength range of about 380 to 780 nanometers. *See* Dkt. 81 ("CAO Op. Br.") at 10. Visible light having a single wavelength is just an example of monochromatic light that will appear as "one color." *See id.* at 9-10 (including citations). It thus is unremarkable that the '961 patent sometimes uses the term "monochromatic light" in the same discussion as the word

---

[1] Feit initially asserted that "monochromatic light" is indefinite. Dkt. 81, Ex. 2. Feit does not now make this argument or attempt to satisfy its burden of establishing that the term is indefinite. Feit has waived any challenge to the definiteness of this claim term.

"wavelength." The language Feit cites stands for the proposition that "[f]or example, if light from the light source 1002 is a single wavelength," then that light is monochromatic light. Dkt. 90 ("Feit Br.") at 5. This is an *example* of monochromatic light; the specification never suggests that a single wavelength is the only way to emit monochromatic light.

Feit also ignores the intrinsic evidence from the reexamination of the '961 patent where the Patent Office and the reexamination petitioners consistently interpreted "monochromatic light" in the context of LEDs as single color LEDs—*e.g.*, red, blue, green, yellow—without any reference to wavelength ranges. *See* CAO Op. Br. at 8. In fact, in a declaration on claim construction submitted in another case, Dr. Bretschneider described monochromatic light emitted by LEDs not by any specific wavelength range but simply by color—red, green, blue—and further noted that the combination of unabsorbed blue light from an LED and limited from the phosphor "may be perceived by the human eye as white." Vare Decl., Ex. 11 at ¶ 36.[2]

Next, Feit must address the prior Illinois district court's construction of this term as "one color." Feit rests its argument on the striking assertion that "focusing on how humans perceive light is incorrect." Feit Br. at 7. How humans perceive light is the entire point of an LED lighting product: visible light is, by definition, the part of the electromagnetic radiation spectrum that humans can see.[3] CAO Op. Br. at 10; Dkt. 81-4, Ex. 3, Shealy Decl. at ¶¶ 25-27. That humans perceive individual LEDs as emitting "monochromatic" (one color) light but the light bulb as a whole emitting "white light" is a primary goal of Dr. Cao's invention. *See* CAO Op. Br. at 6-7; *see also* '961 patent, col. 2:67-3:3 (referring to converting LEDs that emit "blue light into white light").

---

[2] Citations to Exhibits in CAO's Opening Brief are to "Dkt. 81, Ex. __." Citations to Exhibits used in Feit's Responsive Brief are to "Dkt. 90, Ex. __." Citations to Exhibits used in this Reply Brief (Exs. 9, 10, and 11) are included with the concurrently filed Declaration of Todd Vare in Support of Plaintiff's Reply Claim Construction Brief.

[3] *See also* https://science.nasa.gov/search?search_api_views_text=visible+light ("The visible light spectrum is the segment of the electromagnetic spectrum that the human eye can view.").

Abundant intrinsic evidence confirms that the '961 patent addresses light color as it is visible to humans. The claims recite LEDs that emit "monochromatic *visible* light" for use in semiconductor light sources "for emitting light to illuminate a space used by humans." *See* Ex. 1, '961 patent, claim 21 (emphasis added). The Background of the Invention states that the patent relates to semiconductor light sources and illumination devices "for providing visible light in order to partially or fully illuminate a space occupied by or viewed by humans." *Id.*, col. 1:6-10. Feit's argument that it is incorrect to consider how humans perceive light is scientifically incorrect and contrary to the '961 patent teachings and claims.

Feit also attempts to discredit the Illinois district court's construction of "monochromatic light" as single color by asserting that the defendant in that case presented "flawed arguments." Feit Br. at 7. Yet, here, Feit presents the same flawed argument (defining monochromatic light as a single or narrow range of wavelengths) and relies on the same expert (Dr. Bretchsneider). Allowing, as Feit's proposed construction does, that monochromatic light can also result from a "narrow band of wavelengths" does not resolve the parties' dispute. Rather, it merely invites the fact-finder to impermissibly define what it means to have a "narrow band of wavelengths." The claims do not refer to any particular "single wavelength" or "narrow band of wavelengths"; they refer to light of one color—"monochromatic." Feit also fails to mention that the Illinois district court expressly found that Dr. Bretschneider's opinion on "monochromatic light" was "unpersuasive." *See*, Dkt. 81-5, Ex. 4 at 16.

Finally, Feit suggests that CAO's construction creates improper redundancy in the claims as some of the claims require multiple LEDs that emit the same color. On the contrary, these claims recite simply that there is more than one LED emitting the same color: *e.g.*, multiple LEDs emitting the same blue light are present. There is no inconsistency between these claims and others that do not specify a number of LEDs emitting "monochromatic light." In each case, the term "monochromatic light" means a light of a single color.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      "in said interior volume" / "in said base"**

At the outset, Feit misrepresents CAO's position, arguing that CAO re-defines "in" as "partially in." To be clear, CAO's position is that no construction is needed—the word "in" means "in." The term "in" requires neither the modifier "partially" nor Feit's proposal that the Court limit this term to mean "completely" or "entirely within".

Although Feit withdrew the word "entirely" from the express language of its proposed construction, it still proposes the same restriction. Moreover, although it scarcely discusses the Illinois court's construction of this term in its brief (*see* Feit Br. at 9), it invites this Court to make the same mistake made by the Illinois court, which was to state that "in" is limited to "completely *within*" (*id.* at 10) (emphasis in original). As the Federal Circuit found in *Cannon Rubber*, however, the term "in" is entitled to its full scope unless it has been redefined—and the full scope of the plain meaning of the term "in" is broader than "completely within". *See* CAO Op. Br. at 12-13.

There is nothing in the intrinsic record that establishes a clear disavowal of the full scope of the word "in". To the contrary, the specification is replete with examples of using "in" consistent with its ordinary scope, which includes a feature being "in" another feature without being "completely within" it. *See* CAO Op. Br. at 13-14. Nonetheless, using a strawman of its own creation, Feit points to Figure 11 as example illustrating an AC/DC converter that is "entirely within" (or "completely within") the base. Feit Br. at 9. This is an improper attempt to use one example from one drawing to limit the plain meaning of the claim term "in." It is not a clear and unambiguous evidence of disavowal of the full scope of "in." To the contrary, the patent states that "[t]he AC/DC converter may be located in the base 103 or in another location." *See* '961 patent, col. 3:63-64.

Finally, Feit's reliance on *Gentry Gallery* demonstrates the weakness of its argument. *Gentry Gallery* "considers the situation where the patentee's disclosure makes crystal clear that a particular (*i.e.*, narrow) understanding of a claim term is an 'essential element of [the inventor's] invention." *Johnson Worldwide Associates*, 175

5

F.3d at 993. The '961 patent disclosure does not contain any teaching whatsoever that a heat sink "completely within" another structure is an essential element of the claimed invention. Feit's attempt to narrow the scope of the term "in" should be rejected; no construction is needed.

C.    **"heat sink"**

Tellingly, Feit advances no affirmative evidence from the specification or intrinsic record of the '961 patent that its proposed construction is correct. Feit does not once refer to the '961 patent's specification or its file history. Feit cites no instance in the intrinsic record where the words "ambient environment" appear. Instead, Feit relies entirely on a reexamination of a related patent (the '885 patent) to try to apply a prosecution disclaimer argument to the claims of the '961 patent. Feit's prosecution disclaimer argument, however, is wrong for multiple reasons.

First, these statements were made by CAO in an *inter partes* reexamination of a *different* patent with different claims (the '885 patent)—and they were *rejected* by the Patent Office as an improper narrowing of the scope of the claims. *See* Vare Decl., Ex. 10, August 31, 2016 Patent Trial and Appeal Board Decision Affirming Examiner, at 10-11 (rejecting patent owner's description of "heat sink" to be a passive heat exchanger dissipating heat into the ambient environment as lacking "any persuasive support for the proposed construction").

Second, it would be legal error to use CAO's rejected statements regarding "heat sink" in the '885 reexamination against CAO in this case: "Once the examiner or PTAB has expressly rejected a patentee's construction, a potential infringer could not then reasonably rely on the patentee's construction." *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 865-66 (N.D. Cal. 2019) (noting that neither the defendant nor the Court could find a single case in which prosecution disclaimer bound a patentee to its previous arguments where the examiner or PTAB *rejected* those arguments); *accord Motiva Patents, LLC v. Sony Corp.*, No. 9:18-cv-180-JRG-KFG (lead case), 2019 WL 3933670, at *19-*20 (E.D. Tex. Aug. 20, 2019) (refusing to limit

1
2
3
4
5
6

scope of claim term based on allegedly narrow statements about the term's scope made during reexamination because, during reexamination, the Examiner expressly rejected the patentee's argument); *Vertical Tank, Inc. v. BakerCorp.*, No. 1:18-cv-145-LJO-JLT, 2019 WL 2207668, at \*11-\*12 (E.D. Cal. May 22, 2019) ("Critically, Courts have refused to find a disclaimer was made where the purported disclaimer was *rejected* by the patent office.").

7
8
9
10
11
12
13
14
15
16
17
18
19

Third, Feit's argument that "heat sink" must be "an object (a passive heat exchanger) that dissipates heat (e.g., from electronics) into the ambient environment (as opposed to the closed space within the bulb or other adjacent structure, such as a secondary heat sink or the base)" has no support in the patent claim language or specification. The heat sink is plainly described as "any material capable of conducting heat away from the semiconductor devices." '961 patent, col. 3:53-54. The '961 patent also makes clear that heat may be drawn from LEDs into other structures (not directly to the ambient environment): *e.g., id.*, original claim 10 (reciting a primary heat sink mounted on a secondary heat sink such that heat drawn from the LEDs by the primary heat sink would transfer to a secondary heat sink); *id.*, claim 52 (reciting a "support" substantially positioned outside the interior volume of the enclosure that is "in thermal communication with said heat sink that located in said interior volume of said enclosure").

20
21
22
23
24
25
26

Lastly, Feit argues that the term "heat sink" must be limited by the three figures in the '961 patent (Figures 1, 2 and 6) because "[t]here are no other depictions of heat sinks in the '961 patent." Feit Br. at 1. Again, it is legally improper to limit the scope of the term "heat sink" to its depiction in the patent drawings. *MBO Labs*, 474 F.3d at 1333. It also is factually wrong: the '961 patent does describe a heat sink that is part of the base in a way not depicted in these drawings. '961 patent, col. 4:1-3 ("In some embodiments of the invention, the base also may serve as a heat sink. . . .").

27
28

The Court should reject Feit's improper attempt to add modifiers that are not found anywhere in the claims or disclosure. *See Johnson Worldwide Associates*, 175

7

F.3d at 989. The Court should adopt CAO's proposed construction of "heat sink": a structure that draws heat from the LED chips.

### D.    "a plurality of panels"

"A plurality of panels" is a simple term that is understandable by a lay jury. It is a term that admits no size, shape, orientation, or interrelationship of the panels. The surrounding claim language provides some further limits and context: the panels are part of a heat sink, must be suitable for mounting semiconductor devices, and must be oriented to facilitate emission of light in "desired directions." '961 Patent at col. 9:62-67. Of those directions, the specification states that the arrangement may "transmit light in all directions except through the base, or in a manner to direct light in a specific direction." *Id*. at col. 3:39-42 (reference number omitted). In the larger context, the goal is to provide "visible light in order to partially or fully illuminate a space occupied by or viewed by humans." *Id*. at col. 1:7-12. Read alone or in the context of the claims and specification, this is a broad structural term requiring no construction. *See* CAO Op. Br. at 16-17.

Feit impermissibly attempts to import limitations from the specification based only on permissive and exemplary language and embodiments. For example, Feit first relies on language from the Abstract that "[t]he heat sink may have multiple panels for mounting chips in various orientations." Feit Br. at 14. Feit relies expressly on the "various orientations" language in fabricating its construction, but ignores that the described embodiments only "*may* have" this feature (emphasis added). Feit quotes the same language again in the conclusion of that same paragraph of its brief, now omitting the caveat "may have." *Id*. at 14. But the words of the '961 patent should not be ignored; indeed, elsewhere the '961 patent more affirmatively asserts: "Heat sinks used in this invention can be of a variety of shapes and dimensions, such as those depicted in the drawings or any others which are useful for the structure of the particular light source being constructed." '961 Patent at col. 9:30-33.

Feit also relies on carefully selected dictionary definitions for the proposition that panels are flat. Feit Br. at 15. But those definitions undercut Feit's position. For example, one of Feit's dictionaries defines "panel" as "a section of a door, vehicle, item of clothing, etc." Dkt. 90-13, Feit Ex. L. Not only is this definition not expressly "flat," but vehicle panels are typically contoured, not flat. It follows from the "etc." in this definition that a "panel" could be "a section of a heatsink" that can be contoured and not completely flat. Feit also quotes a definition of "panel" that is "a flat board on which instruments or controls are fixed," while ignoring the more expansive definition from the other of its two dictionaries—that a "panel" is "a mount for controls or dials" with no requirement that it be flat. *Compare* Feit Br. at 15 *with* Dkt. 90-12, Feit Ex. K. Even if advisable to rely on general purpose dictionaries, Feit's own definitions undercut its claim construction position and, instead, demonstrate that the plain meaning of "panel" is not limited to items that are flat. The term "plurality of panels" needs no construction.

**E.    "oriented to facilitate emission of light … in desired directions"**

Feit relies heavily on *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005), *abrogated by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014), to argue that "in desired directions" is indefinite. That reliance is misplaced. First, Feit states that *Datamize* was abrogated "on other grounds" by the Supreme Court. Feit Br. at 16. *Datamize* was abrogated because it used the wrong standard for indefiniteness—those grounds are relevant to Feit's citation.

*Datamize* also is distinguishable on its facts. The claim term at issue in *Datamize* was "aesthetically pleasing." 417 F.3d at 1348. As the court noted and Feit quotes, there was no standard by which to measure whether something was or was not aesthetically pleasing. Beauty is, after all, in the eye of the beholder.

That is not the case here. The term "desired directions" relates to the emission of light, and the emission of light is described as being for the purpose of partially or fully illuminating spaces used by humans, such as room. A claim term is indefinite if it fails to "inform those skilled in the art about the scope of the invention with reasonable

9

certainty." *Nautilus*, 572 U.S. at 910. Feit has not even tried to meet its heavy burden to prove, by clear and convincing evidence, that persons of skill in the art cannot determine with reasonable certainty whether an LED lamp emitting light in "desired directions" partially or wholly illuminates a space used by humans. Although Feit presents attorney argument that the '961 patent provides no guidance for emitting light "in desired directions," Feit itself fails to provide any concrete "clear and convincing evidence"—such as expert testimony—that a person of ordinary skill in the art reading the claim language in the context of the patent disclosure could not determine, with reasonable certainty, how to orient structures of the LED light source to facilitate emission of light in desired directions. *See H. Lundbeck A/S v. Apotex Inc.*, No. 18-cv-88-LPS, 2020 WL 777210, at *3 (D. Del. Feb. 18, 2020) (rejecting defendant's indefiniteness argument because defendant failed to provide any concrete evidence, such as expert testimony, to show a person of ordinary skill in the art could not determine with reasonable certainty the scope of the claimed invention). Even if "desired directions" requires a user's foreknowledge of certain facts—such as what type of space is to be partially or wholly illuminated—that does not make the term indefinite (which even *Datamize* recognized). *See Datamize*, 417 F.3d at 1355-56. Here, Feit presents no evidence other than attorney argument that a person of skill in the art would not understand facilitating the emission of light in desired directions for illumination may vary depending on the circumstance of the space.

Feit also completely ignores the fact that throughout the multiple reexaminations of the '961 patent, the Patent Office and the parties seeking reexaminations were perfectly capable of understanding the scope of "desired directions" with reasonable certainty. *See*, *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1379-80 (Fed. Cir. 2017) (reversing finding of indefiniteness, and noting that no one involved in reexamination proceedings or the accused infringer itself in presenting invalidity contentions had any apparent difficulty in determining the scope of the term "visually negligible," which  was compelling evidence that the term is understood by persons of

10

skill in the art with reasonable certainty and not indefinite). In this case, the claimed LED light source is intended to partially or fully illuminate spaces occupied or viewed by humans. *See*, CAO Op. Br. at 18, citing '961 patent, col. 1:9-12, 1:56-58, 3:1-2. The patent further gives examples of spaces used by humans, such as residential spaces, commercial spaces, and outdoor spaces. *Id.*, citing '961 patent, col. 1:9-12. These are not unique spaces unknown to humans but are spaces that have been subject of illumination efforts since the introduction of lighting sources. Persons of skill in the art would understand how to facilitate emission of light from the claimed LED light source in desired directions for the intended illumination of a space, such as a room in a house, as they did with light from an incandescent or other light source.[4]

Finally, Feit's alternative argument that the term "desired directions" must mean "in more than one direction" improperly relies on importing from the specification the panel structure from an embodiment reflected in Figure 1. Feit compounds its error by elaborating that "the depicted LEDs are angled to emit light in *multiple* directions." Feit Br. at 18. Nothing in the claim language suggests the LEDs must be *angled* or the "desired directions" cannot be uniform or overlapping. The Court should reject both of Feit's arguments on this claim term and find that the term is not indefinite and has its plain and ordinary meaning and therefore needs no construction.

## F.   "a contact layer on which an electron may be mounted"

There is no dispute that judicial correction is proper if 1) the correction is not subject to reasonable debate in view of the claim language and specification and 2) the prosecution history does not suggest a different interpretation of the claims. Here, the '961 patent specification consistently describes an "electrode" being mounted on a contact layer. CAO Op. Br. at 21. The reexamination history also demonstrates that the

---

[4] Feit's argument that the "desired direction" of illuminating spaces used by humans is superfluous is wrong. The term "desired directions" appears in context with the orientation of panels to facilitate the intended direction of light; the preamble's use of illuminating spaces used by humans more broadly relates to the general purpose of the claimed LED light source. These are consistent, not superfluous.

11

term "electron" was considered a typo and replaced with "electrode" by the Patent Office and the reexamination petitioners. *Id.* at 21-22.

Feit never disputes or even addresses how the claim term "electron" is treated in the '961 patent specification of throughout the reexamination history—the two primary sources for judicial correction. Instead, Feit's position rests on two oddly inconsistent arguments in an effort to manufacture "reasonable debate": first, through its expert, Feit argues that the claim, as written, is an impossibility and cannot be correct; yet, second, Feit argues that there is reasonable debate as to whether the claim, as originally written, is correct. Feit is wrong on both counts.

Feit first relies on its expert, Dr. Bretschneider, to argue that it is impossible to mount an electron on a contact layer. However, CAO's expert, Dr. Shealy, explains that mounting an electrode on an n-type contact layer results in the placement of an electron in the conduction band of that contact layer. *See* Dkt. 81-4, Ex. 3, Shealy Decl. at ¶¶ 43-45; *see also* Vare Decl., Ex. 9, Shealy Reply Decl. at ¶¶ 11-12. In that way, an electron is placed in the conduction band of the contact layer. *Id.*

Having first suggested the claimed "electron" presents an impossibility, Feit turns around and asserts that persons of skill in the art would not immediately recognize that the use of "electron" is a typo and that "electrode" is the correct term. Feit never reconciles its argument that a person of ordinary skill in the art would both believe the language as written using "electron" was a physical impossibility, but somehow have a reasonable doubt that "electron" was a typo and "electrode" was in fact intended. Further, Feit advances no explanation whatsoever how reasonable minds of persons of skill in the art could come to any conclusion other than that "electrode" was intended here. Feit simply asserts that a debate exists. Nor does Feit address the consistent statements in the specification using "electrode" in the context of contact layers. And Feit never once even acknowledges the fact that essentially *everyone* who has read this claim—the Patent Office, industry leaders such as GE and Osram, CAO, and even Feit *in this very case* through its invalidity contentions—have assumed that the term

"electrode" was intended, not "electron." *See* CAO Op. Br. at 21-22. Not only is there no reasonable debate over the meaning or scope of this claim term, but the public record at the Patent Office gives notice to the world that the term "electron" should be construed as "electrode." Feit simply ignores this overwhelming evidence that supports correcting "electron" to "electrode."

To divert attention from application of the legal standard based on the claim language, specification, and prosecution history, Feit resorts to an excerpt from a prior statement by Dr. Shealy in another case, which it then misreads. Contrary to Feit's suggestion, Dr. Shealy's testimony in the other case and this case is entirely consistent. Vare Decl., Ex. 9, Shealy Reply Decl. at ¶ 13-16. Moreover, the sentence highlighted in Feit's brief (at 19:20-22) is both a correct statement but also not relevant to whether "electron" should read "electrode." That highlighted statement simply explains that an electrode is not a contact layer but instead is a metal contact relating to ohmic metallizations when placed on a contact layer. *Id*.

Finally, Feit stokes innuendo by questioning why CAO did not file a formal petition for correction. But—in view of the clear statements in the patent specification and how everyone through the long history of this patent, through multiple reexaminations, applied the word "electrode" without hesitation—CAO did not need to. Because the claim language and specification make clear "electron" should be understood to be "electrode" and because the reexamination history similarly establishes that usage of "electrode," this Court should construe the term "electron" as "electrode." No other construction is required.

### G. "reflective layers … to reflect light emitted by said active layer"

Feit first argues that the term "reflective layer" is broad, and encompasses many structures. There is no prohibition on a claim term having a broad scope, however. Dr. Cao chose to describe this aspect of his invention using an ordinary term and, absent clear disavowal, he is entitled to its full scope.

Feit does not attempt to establish that Dr. Cao intended to limit this claim term through disavowal or re-definition. Claim 21, by its terms, is directed to LED chips. The claim language of claim 8, from which claim 21 depends, simply recites in relevant part, "said reflective layers *serving to reflect light emitted by said active layer*." (Emphasis added.) Through its expert, Feit wrongly imports limitations regarding reflective layers from context of VCSEL chip embodiments described in the specification. Nothing in the claim language—the starting point for all claim construction—limits the structure of a reflective layer and certainly not to the context of the VCSEL chip embodiments. The broad and ordinary meaning of "reflective layers" as simply "serving to reflect light" should not be restricted by embodiments in the specification. *Aventis*, 675 F.3d at 1331.

Feit also relies on its expert to impart the requirement that the reflective layers must reflect "a majority" of light emitted by the active layer. Nothing in the intrinsic record to support this conclusion. Nowhere does the '961 patent discuss any specific amount of reflectivity by the reflective layers. This added requirement is simply tacked on by Dr. Bretschneider.[5]

Feit also all but ignores the fact that it made this very same argument and lost, in this very Court in *Zadro Prods., Inc. v. Feit Electric Co., Inc.*, No 20-cv-101-JVS, 2021 WL 144247 (C.D. Cal. Jan. 6, 2021). *Zadro* correctly held that "reflective" was an ordinary term needing no construction. *See* CAO Op. Br. at 22-23. Feit's only attempt to distinguish that decision is that, in *Zadro*, the patent did not specifically indicate how much light was reflected. Yet, here, the '961 patent *also* does not require that the reflective layer reflect any specific amount of light emitted by the active layer.

Feit is also wrong to try to limit the term "layer." For example, in *Cree*, the district court found that the term "layer" used in a patent describing LED construction did not need construction. *Cree, Inc. v. SemiLEDs Corp.*, 2012 WL 975697, at *4 (D.

---

[5] Although not argued by Feit in its brief, Dr. Bretschneider compounds his restrictive interpretation of "reflective layers" to reach the conclusion that such layers are not even used in LEDs. He is wrong. Reflective layers are commonly found in LED chips used in semiconductor light sources. *See* Vare Decl., Ex. 9, Shealy Reply Decl. at ¶¶ 17-19.

Del. Mar. 21, 2012). Feit's only rebuttal to that decision was that the patent at issue in *Cree* contained no clear disavowal of the ordinary scope of the claim term. But, again, the '961 patent also does not expressly limit or narrow the ordinary meaning of the word "layer." Feit does not even attempt to establish that the '961 patent evinces a clear disavowal of this claim term.

In the present case, the claims themselves rebut Feit's attempts to narrow the "reflective layers" term to add modifiers like separate or distinct. While some layers are said in the claims to be arranged in a particular way (*e.g.*, "a first cladding layer . . . being adjacent to said buffer layer," '961 patent, col. 10:34-36), the reflective layers are recited simply to be located on opposite sides of the LED's active layer with no limitations other than that they perform the function of reflecting light from the active layer. *Id.*, col. 10:44-48. Where, like here, "there is nothing in the claim language or specification that supports narrowly construing the terms to require a specific structural requirement or entirely distinct [layers]," the correct construction "defin[es] the terms broadly to not require entirely separate and distinct [layers]." *Linear Tech. Corp. v. Int'l. Trade Com'n*, 556 F.3d 1049, 1054-55 (Fed. Cir. 2009); *see also*, *Skedco, Inc. v. Strategic Operations, Inc.*, 685 Fed. App'x. 956, 959-60 (Fed. Cir. 2017) (not selected for publication) (where "nothing in the claims requires the pump and valve to be physically separated," it was error to construe the claim "to require the pump and valve to be physically separate structures").

The term "reflective layer" is entitled to its full scope and ordinary meaning.

**III.   Conclusion**

For the foregoing reasons, and each of them, this Court should adopt CAO's proposed constructions or find that no construction is necessary.

Dated: August 2, 2021

**BARNES & THORNBURG LLP**

By: */s/ Roya Rahmanpour*
    Todd G. Vare
    Paul B. Hunt
    Jeff M. Barron
    Seth A. Gold
    Roya Rahmanpour
    E. Sahara L. Williams

*Attorneys for Plaintiff* CAO Lighting, Inc.